UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------X
JOSIAS TCHATAT,                                          )
                                                         )
                                Plaintiff,               )
                                                         )
        -against-                                        )
                                                         )        **14 Civ. 2385 (LGS) (GWG)**
THE CITY OF NEW YORK; POLICE OFFICER                     )
LIAM O'HARA, Shield No. 20203; POLICE                    )
OFFICER HARRY AROCHO, Shield No. 24345;                  )
JOHN DOES; RICHARD ROES; BEST BUY CO.,                   )
INC., d/b/a BEST BUY CO. OF MINNESOTA;                   )
SHWON EDMONDS; RICHARD CASTELLANO;                       )
VAN MOBLEY; JESSE KEMPEN; JESSICA                        )
DELESTIN; IAN PALMER; EASTERN                            )
SECURITY CORP.; SAMUEL J. VOTTA;                         )
ISIDORE CALECA; and MICHAEL MOES,                        )
                                                         )
                                Defendants.              )
----------------------------------------------------------X


PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF MOTION TO PRECLUDE THE
AMENDED EXPERT REPORT OF DR. JONATHAN M. RAINES AND FOR RELIEF UNDER
<u>DAUBERT V. MERRELL DOW PHARMACEUTICALS</u>, 509 U.S. 579 (1993)


1

TABLE OF CONTENTS

RELEVANT PROCEDURAL HISTORY ...........................................................3

ARGUMENT ...................................................................................................4

THE AMENDED EXPERT REPORT GOES WELL BEYOND
PERMISSIBLE EXPERT TESTIMONY, AND INVADES THE
PROVINCE OF THE JURY IN OPINING ON PLAINTIFF'S
CREDIBILITY AND ON THE ULTIMATE ISSUES IN THE
CASE. THE REPORT ALSO SHOULD BE PRECLUDED UNDER
FED.R.EV. 403, AND AS SCIENTIFICALLY INVALID AND
UNRELIABLE UNDER DAUBERT……………………………………………………4

     I.      The Court's role under Rule 702 and Daubert …………............................7

     II.     Dr. Raines did not meet or speak with Plaintiff at any
           point...................................................................................................... 9

     III.    Dr. Raines cherry-picked, and significantly misrepresented,
           information from the  limited materials he reviewed, and
           failed to review all of the information available to
           him........................................................................................................ 14

     IV.    Even if parts of Dr. Raines' amended report would otherwise
           be deemed appropriate,any probative value to the amended
           report is substantially outweighed by the danger of unfair
           prejudice, confusing the issues, and misleading the jury,
           and should be barred under Fed.R.Ev. 403................................................ 19

CONCLUSION ............................................................................................ 21

## RELEVANT PROCEDURAL HISTORY

Defendants served the original expert report of Dr. Jonathan M. Raines (annexed to the 4/13/16 Rothman Declaration ("Rothman Decl.") as Exhibit 1) on November 23, 2015.  Upon reviewing Dr. Raines' report, it was immediately apparent to the undersigned that it was rife with improprieties.  The report improperly invaded the province of the jury in opining on Plaintiff's credibility and on the ultimate issues in the case, and was scientifically invalid and unreliable under Daubert.  The undersigned suggested to opposing counsel – in order to avoid the significant cost of my needing to procure a rebuttal psychiatric expert to review and opine upon a large volume of documents – that we litigate prior to that a motion to preclude / Daubert motion with regard to the expert report.  In the event the report was precluded in whole or in significant part, such would either eliminate entirely the need for, or significantly reduce the cost of, a rebuttal expert. All of the Defendants refused to consent to that suggestion, so the undersigned wrote Judge Gorenstein on December 3, 2015 (docket # 238) to make the request and to give my reasons as to why proceeding in this manner made eminent good sense.

By Order dated December 9, 2015 (docket # 243) Judge Gorenstein granted my request to move, at this juncture (prior to having to retain a rebuttal expert), to preclude and/or for relief under Daubert (hereinafter, "motion to preclude").  Judge Gorenstein's Order stated, in part, as follows:

> The Court has considered plaintiff's application for an extension and the
> defendants' opposition letters. The quoted portions of Dr. Raines's expert report,
> coupled with the allegation that Dr. Raines did not examine plaintiff, raise

3

sufficient concerns that the Court deems it appropriate to adjudicate the
admissibility of the report before requiring plaintiff to go to the
expense of rebutting it.

On December 23, 2015, a month after the November 23, 2015 deadline had passed for
submitting their expert report, Defendants unilaterally – without seeking either my consent or
requesting leave from the Court – withdrew Dr. Raines' original report and purported to serve
upon me an amended report, also authored by Dr. Raines.  The amended report removed some
material from the original report, but also relied on studies that were not relied upon in the
original report, and added a significant amount of new substantive material that was not included
in the original report that was served on November 23, 2015.  The amended report also was
authored by Dr. Raines without his having examined Plaintiff.

On December 31, 2015 Judge Gorenstein issued a Text Only Order (docket # 247) which,
over Plaintiff's opposition, granted Defendants' belated request for an extension to serve the
amended expert report.  By Order dated March 16, 2016 (docket entry # 266) Judge Gorenstein
set forth the briefing schedule to be followed by the parties with regard to the instant motion.

## ARGUMENT

**THE AMENDED EXPERT REPORT GOES WELL BEYOND PERMISSIBLE EXPERT
TESTIMONY, AND INVADES THE PROVINCE OF THE JURY IN OPINING ON
PLAINTIFF'S CREDIBILITY AND ON THE ULTIMATE ISSUES IN THE CASE. THE
REPORT ALSO SHOULD BE PRECLUDED UNDER FED.R.EV. 403, AND AS
SCIENTIFICALLY INVALID AND UNRELIABLE UNDER <u>DAUBERT</u>.**

In preparation of both the original report and the amended report, Dr. Raines reviewed
only the Amended Complaint, the Plaintiff's deposition testimony, and the Plaintiff's medical
records. He never met with or spoke with Plaintiff, and did not review any of the Defendants'

various voluminous testimonies or documentary statements concerning the incidents at issue in

this case, which conflict materially, and are utterly absurd, in numerous places.  Dr. Raines also

did not make mention in either of his reports of the Defendants' spoliation of the all of the vital

items of evidence in this case, or of the Defendants' fabrication of evidence[1].

In evaluating the amended expert report at issue herein, the Court must also examine the

original expert report, which lays bare the highly prejudicial and manifestly improper purposes

that the Defendants are hoping to achieve at the trial of this action through Dr. Raines.  Despite

the limited information used by him to prepare both of his reports (and a misrepresentation of the

limited information that he did have in both reports, as discussed *infra*) - and, more importantly,

despite the manifest impropriety of opining on Plaintiff's credibility and on the ultimate issues in

the case - Dr. Raines' original report makes reference to Plaintiff's motive to lie for monetary gain

in this lawsuit, and his view that there is "reason to view his veracity with a high degree of

suspicion." Dr. Raines' original report concludes as follows:

---

[1] Dr. Raines' reliance on just this limited amount of information was both unscientific and
unethical.  *See*, American Academy of Psychiatry and Law, "Ethics Guidelines for the Practice of
Forensic Psychiatry" (Adopted May, 2005) at Section IV. Honesty and Striving for Objectivity:

> The adversarial nature of most legal processes presents special hazards for the practice of
> forensic psychiatry. Being retained by one side in a civil or criminal matter exposes
> psychiatrists to the potential for unintended bias and the danger of distortion of their
> opinion. It is the responsibility of psychiatrists to minimize such hazards by acting in an
> honest manner and striving to reach an objective opinion.
> Psychiatrists practicing in a forensic role enhance the honesty and objectivity of their work
> by basing their forensic opinions, forensic reports and forensic testimony on all available
> data.

(emphasis added).  The American Academy of Psychiatry and Law, "Ethics Guidelines for the
Practice of Forensic Psychiatry" (Adopted May, 2005), is annexed to the Rothman Decl. as
Exhibit 4.

In summary it is my opinion, within a reasonable degree of medical certainty, that Mr. Tchatat suffers from ███████████████ and ██████████ ████████████. I am of the opinion that his allegations regarding the alleged incident(s) of September 20, 2011 are not ███████████, but rather are ██████████ in nature, and in fact, did not occur. Furthermore, I am of the opinion that he is attempting to use his ████████ in a manipulative, self-serving manner, of which this litigation is the end result.

Upon receipt of the original report I then pointed out to the Court that this sort of an opinion from an expert is patently improper. *See*, Nimely v. City of New York, et al., 414 F.3d 381, 397-98 (2d Cir. 2005):

It is a well-recognized principle of our trial system that "determining the weight and credibility of [a witness's] testimony. . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men . . . ." Aetna Life Ins. Co. v. Ward, 140 U.S. 76, 88, 35 L. Ed. 371, 11 S. Ct. 720 (1891); *see also* United States v. Scop, 846 F.2d 135, 142 (2d Cir. 1998) ("The credibility of witnesses is exclusively for the determination by the jury, and *witnesses may not opine as to the credibility of the testimony of other witnesses at the trial*." (internal citation omitted and emphasis added)). Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702. *See, e.g.,* United States v. Lumpkin, 192 F.3d 280, 289 (2d Cir. 1999); Scop, 846 F.2d at 142-43; *see also, e.g.,* United States v. Charley, 189 F.3d 1251, 1267 (10th Cir. 1999); Westcott v. Crinklaw, 68 F.3d 1073, 1076-77 (8th Cir. 1995).

(emphasis in original). I also pointed out that, as in Nimely, this is "a case in which witness credibility [i]s the central issue." Id. at 400. *See also*, Nichols v. Am. Nat'l Ins. Co., 154 F.3d 875, 883 (8th Cir. 1998):

The challenged testimony impugning Nichols' psychiatric credibility and suggesting that recall bias, secondary gain, and malingering had influenced her story was not a proper subject of expert testimony under *Fed. R. Evid. 702*. The record does not show that these theories met the Daubert criteria, and in her testimony Dr. Pribor sought to answer the very question at the heart of the jury's task -- could Nichols be believed?

6

(footnote omitted).

After the Court's Order dated December 9, 2015 (docket # 243) granted my request to move, at this juncture, to preclude the original expert report, Defendants saw the writing on the wall and that they would not be permitted to use the original report to accomplish the improper and highly prejudicial purposes that they sought to attain through it and through Dr. Raines.  They then served Dr. Raines' amended expert report, which purported to remedy the problems contained in the original report.  The amended report remains manifestly improper and unreliable, however, and remains highly prejudicial, and it is plain that the City Defendants are now attempting to accomplish indirectly in the amended report the exact same improper commentary upon Plaintiff's credibility, Plaintiff's motive for secondary gain through this lawsuit, and the ultimate issues in the case that they attempted to do directly in the original report.  The Court ought not to countenance this.  Whether accomplished directly, or indirectly through innuendo and pseudo-science, the Court must act as gatekeeper to protect the integrity of this process, and keep this improper expert testimony from prejudicing and confusing the jury in this case.  Dr. Raines' amended report does not present science or anything resembling a proper scientific methodology – it is simply and plainly mercenary pseudoscience.


I.     The Court's role under Rule 702 and Daubert

Under Rule 702 and Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579 (1993), district courts "are assigned a critical gatekeeping role at the boundary between real science and junk science." Davis v. Carroll, 2013 U.S. Dist. LEXIS 45884, at *53.   After first determining whether the expert has sufficient qualifications to testify, the next question is "whether the

proffered testimony has a sufficiently reliable foundation." Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 265 (2d Cir. 2002) (internal quotations omitted).  "In this inquiry, the district court should consider the indicia of reliability identified in Rule 702, namely, (1) that the testimony is grounded on sufficient facts or data; (2) that the testimony 'is the product of reliable principles and methods'; and (3) that 'the witness has applied the principles and methods reliably to the facts of the case.'" Id. (quoting Fed. R. Evid. 702).  With respect to the reliability of "principles and methods,"

> [t]he Supreme Court has identified a number of factors bearing on reliability that district courts may consider, such as (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) a technique's known or potential rate of error, and the existence and maintenance of standards controlling the technique's operation; and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community.

Id. at 266 (quotation marks and internal citations omitted).  Expert testimony therefore must be excluded "if it is speculative or conjectural" or if is "based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison." Davis v. Carroll, 2013 U.S. Dist. LEXIS 45884, *56-57 (citing Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC, 571 F.3d 206, 213-14 [2d Cir. 2009]). "This is particularly true where a field is characterized by established standards for arriving at expert conclusions and a proposed expert fails to engage with those standards, departs from them in a report, or cannot cite published works in support of a position." Id. (citing Dev. Specialists, Inc. v. Weiser Realty Advisors LLC, 2012 U.S. Dist. LEXIS 8666, *8 [S.D.N.Y. Jan. 24, 2012]).  If a court concludes that an expert opinion "is based on data, a methodology, or studies that are simply inadequate to

support the conclusions reached, <u>Daubert</u> and Rule 702 mandate the exclusion of that unreliable opinion testimony." <u>Davis v. Carroll</u>, 2013 U.S. Dist. LEXIS 45884, at *59 (citing <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d at 266).   An expert's proponent bears the burden of proving by a preponderance of the evidence that the evidence is reliable.  *See*, <u>Daubert</u>, 509 U.S. at 592; <u>United States v. Williams</u>, 506 F.3d 151, 160 (2d Cir. 2007).

In precluding a psychiatric expert's report, Judge Rakoff has held that "[a]n anecdotal account of one expert's experience, however extensive or impressive the numbers it encompasses, does not by itself equate to a methodology, let alone one generally accepted by the scientific community.  <u>Algarin v. NYC Dept. of Corr.</u>, 460 F. Supp. 2d at 477 (citing <u>Berk v. St. Vincent's Hosp. and Med. Ctr.</u>, 380 F. Supp. 2d 334, 354 [S.D.N.Y. 2005] and <u>GE v. Joiner</u>, 522 U.S. 136, 146 [1997] ["nothing in either <u>Daubert</u> or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert"]).  If a challenged expert's report is "not based on reliable principles and methods and is not helpful to the task at hand," it is inadmissible under <u>Daubert</u> and Fed. R. Evid. 702.  <u>Id</u>. at 477.

II.   <u>Dr. Raines did not meet or speak with Plaintiff at any point.</u>

The initial failure of the amended report is that Dr. Raines did not meet or speak with Plaintiff at any point.  Despite this, he purports to be able to diagnose Plaintiff based solely on his review of the Amended Complaint, the Plaintiff's deposition testimony, and the Plaintiff's medical records.  At no point has Dr. Raines ever seen Plaintiff or observed Plaintiff's demeanor or affect, or engaged in his own conversation with Plaintiff, which any responsible and ethical mental health

professional would feel obligated to do before purporting to give a diagnosis. *See*, Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition (DSM-5[2]) at page 21, in which, in the section denoted "Use of the Manual," under the heading "Elements of a Diagnosis" and the subheading "Diagnostic Criteria and Descriptors" it states that "<u>[o]n the basis of the clinical interview</u>, text descriptions, criteria, and clinician judgment, a final diagnosis is made." (emphasis added). *See also*, American Academy of Psychiatry and Law, "Ethics Guidelines for the Practice of Forensic Psychiatry" (Adopted May, 2005)[3] at Section II. Confidentiality, Commentary:

> Psychiatrists should indicate for whom <u>they are conducting the examination</u> and what they will do with the information obtained. <u>At the beginning of a forensic evaluation, care should be taken to explicitly inform the evaluee</u> that the psychiatrist is not the evaluee's "doctor." Psychiatrists have a continuing obligation to be sensitive to the fact that although a warning has been given, the evaluee may develop the belief that there is a treatment relationship.

(emphasis added). *See also*, <u>Id</u>. at Section III. Consent:

> At the outset <u>of a face-to-face evaluation</u>, notice should be given to the evaluee of the nature and purpose of the evaluation and the limits of its confidentiality. The informed consent of the person <u>undergoing the forensic evaluation</u> should be obtained when necessary and feasible. If the evaluee is not competent to give consent, the evaluator should follow the appropriate laws of the jurisdiction.

(emphasis added). *See also*, <u>Id</u>. at Section IV. Honesty and Striving for Objectivity:

> When psychiatrists function as experts within the legal process, they should adhere to the principle of honesty and should strive for objectivity. Although they may be retained by one party to a civil or criminal matter, psychiatrists should adhere to these principles <u>when conducting evaluations</u>, applying clinical data to legal criteria, and expressing opinions.

---

[2] Relevant excerpts from the DSM-5 are annexed to the Rothman Decl. as Exhibit 3.

[3] As noted above, the American Academy of Psychiatry and Law, "Ethics Guidelines for the Practice of Forensic Psychiatry" (Adopted May, 2005) is annexed to the Rothman Decl. as Exhibit 4.

(emphasis added).  And, in the Commentary to Section IV. Honesty and Striving for Objectivity it

states, most directly and unambiguously:

> Honesty, objectivity and the adequacy of the clinical evaluation may be called into question when an expert opinion is offered without a personal examination.  For certain evaluations (such as record reviews for malpractice cases), a personal examination is not required. In all other forensic evaluations, if, after appropriate effort, it is not feasible to conduct a personal examination, an opinion may nonetheless be rendered on the basis of other information. Under these circumstances, it is the responsibility of psychiatrists to make earnest efforts to ensure that their statements, opinions and any reports or testimony based on those opinions, clearly state that there was no personal examination and note any resulting limitations to their opinions.

 (emphasis added).  There was nothing about the circumstances of this litigation that made it in

any way infeasible for Dr. Raines to have conducted a personal examination of Plaintiff.  Not only

did he not do so, however, but both of his reports were entirely cocksure in every respect as to

Plaintiff's supposed lack of credibility, motive for secondary gain, and his inability to accurately

describe the events that occurred inside of the Best Buy store on the date of the incident.  There is

not a trace of effort made by Dr. Raines in either the original report or the amended report to

"make earnest efforts to ensure that [his] statements, opinions and any reports or testimony based

on those opinions, clearly state that there was no personal examination and note any resulting

limitations to [his] opinions."

Further, despite noting on page 1 of the amended report that Plaintiff "is presently a 26-

year-old single black male … [who] was born in Cameroon, Africa and immigrated to the United

States when he was 19 years old," Dr. Raines purports to diagnose him and opine about him with

utter confidence, without having ever examined him, and despite his *curriculum vitae* (annexed as

Appendix A to both the original report and the amended report) giving no indication of any

special training or expertise in the evaluation of persons of foreign cultures.  *See*, Id. at Section V.

Qualifications, Commentary:

> When providing expert opinion, reports, and testimony, psychiatrists should present their qualifications accurately and precisely. As a correlate of the principle that expertise may be appropriately claimed only in areas of actual knowledge, skill, training and experience, <u>there are areas of special expertise, such as the evaluation of</u> children, <u>persons of foreign cultures</u>, or prisoners, <u>that may require special training or expertise</u>.

(emphasis added).

So important is the need for a personal interview in rendering responsible and professional

mental health opinions, that the American Psychiatric Association has even forbidden its members

from rendering opinions about public figures (including those running for high elected office).

*See*, New York Times, "Should Therapists Analyze Presidential Candidates," by Robert Klitzman

(professor of psychiatry and the director of the bioethics master's program at Columbia

University), dated March 7, 2016 (annexed as Exhibit 5 to the Rothman Decl.):

> <u>The American Psychiatric Association (A.P.A.) prohibits its members from giving professional opinions about public figures we have not interviewed.</u>
> …
> the A.P.A. issued "The Goldwater Rule":
>
> *On occasion psychiatrists are asked for an opinion about an individual who is in the light of public attention or who has disclosed information about himself/herself through public media. In such circumstances, a psychiatrist may share with the public his or her expertise about psychiatric issues in general. However, <u>it is unethical for a psychiatrist to offer a professional opinion unless he or she has conducted an examination</u> and has been granted proper authorization for such a statement.*
>
> <u>To diagnose conditions in someone we've never met — let alone offer treatment recommendations — is fraught both ethically and scientifically. Assessing patients face to face and finding out their experiences and history, much of which is private, and has perhaps never been disclosed to anyone, is essential. Otherwise, we risk making big errors and fostering confusion.</u>

(underlining added; italics in original).

In a March 11, 2016 letter to New York Times in response to Professor Klitzman's piece, Susan H. McDaniel, the President of the American Psychological Association[4], wrote:

> The American Psychological Association wholeheartedly agrees with Dr. Robert Klitzman that neither psychiatrists nor psychologists should offer diagnoses of candidates or any other living public figure they have never examined.
>
> Similar to the psychiatrists' Goldwater Rule, our code of ethics exhorts psychologists … [that] [w]hen providing opinions of psychological characteristics, psychologists must conduct an examination "adequate to support statements or conclusions." In other words, our ethical code states that psychologists should not offer a diagnosis in the media of a living public figure they have not examined.

(emphasis added).

It is clear from all of these sources that in order to formulate a responsible and methodologically sound diagnostic impression, any responsible and ethical mental health professional would seek to conduct an interview of the person to be diagnosed. Dr. Raines did not to do, yet he still had no hesitation (and indicated no reservations) about concluding the amended report by diagnosing Plaintiff as follows:

> Based on my review of the relevant medical records and Mr. Tchatat's deposition testimony, it is also my opinion, within a reasonable degree of medical certainty, that Mr. Tchatat suffers from ███████████████████ and ██████████████████, and suffered from this condition at the time of the incident in question. It is my opinion, within a reasonable degree of medical certainty, that because of this, Mr. Tchatat was suffering from disorders that would tend to have induced ████████ ████████ on his part, a deficit in his ability to ██████████████████, and give rise to █████████. It is further my opinion, within a reasonable degree of medical certainty, that Mr. Tchatat was potentially subject to ████████████, which would have significant potential to impact his recollection of events during the time he was suffering from these disorders.

---

[4] Ms. McDaniel's letter to the New York Times is annexed as Exhibit 6 to the Rothman Decl.

Dr. Raines' amended report is therefore scientifically unreliable, and has been prepared in a professionally unethical and irresponsible manner.

III. <u>Dr. Raines cherry-picked, and significantly misrepresented, information from the limited materials he reviewed, and failed to review all of the information available to him.</u>

Dr. Raines cherry-picked, and significantly misrepresented information from the limited materials he reviewed, and failed to review all of the information available to him.  For example, on page 2 of the amended report (which is not page numbered) he states that "[Plaintiff] testified that he ████████ constantly, almost on a daily basis."  But Dr. Raines does not mention at all in his amended report – anywhere – that Plaintiff testified at his deposition that on the date of the incident he was not ████████, and that, during the many times prior to the date of the incident when he had experienced ████████ and ████████████, he had never during the course of those ████████ heard a racial slur as part of a ████████[5]  *See*, 360:25-361:12 of Plaintiff's deposition testimony (excerpts of which are annexed as Exhibit 7 to the Rothman Decl.).

Dr. Raines, also on page 2 of the amended report, cites to the Emergency Room records from St. Luke's Hospital[6], where Plaintiff was treated while in police custody immediately following his arrest at the Best Buy store on September 20, 2011.  Conspicuously absent from Dr. Raines' commentary, however, are the notations from those records that Plaintiff "speaks in full sentences" (on Bates No. 136) and that Dr. Amy Caggiula, M.D. noted that "[t]he history is limited by nothing – patient appears as a reliable historian" (on Bates No. 210).  Further, while

---

[5] Plaintiff has alleged - *See*, Amended Complaint ¶ 41 - that he was called a "nigger" by one or more of the store employees who arrested and beat him during the course of the incident.

[6] The September 20, 2011 Emergency Room records from St. Luke's Hospital (Bates Nos. 133-137 and 210-214) are annexed as Exhibit 8 to the Rothman Decl.

Dr. Raines says on page 2 of the amended report that "[t]he records of this examination note no evidence whatsoever of any physical trauma to any part of his body" and says that the records state that Plaintiff "told the medical staff that on a scale of 0 to 10 he considered his pain 'none'," this is a total misrepresentation of what these medical records state.  Plaintiff is noted throughout these records as complaining of "back pain" (on Bates Nos. 134, 210, and 212) and "pleuritic pain" (on Bates Nos. 136 and 212) and that he was "kicked in the back and left leg and now has pain … [and] Patient says pain is worse with deep inspiration" (Bates No. 210) and the records note that he received pain medication in the form of Motrin (Ibuprofin) (on Bates No. 135) and that on a "pain assessment" given by Marvin Friedman, RN, Plaintiff reported / was assessed "Pain Scale: 5/10."[7]

Dr. Raines also quotes on page 2 of the amended report from the psychiatric examinations Plaintiff was given while in custody on January 12, 2012 and January 30, 2012, after he had already been incarcerated for four months as a result of his arrest on September 20, 2011 and the resulting prosecution at issue in this case.  Dr. Raines completely ignores, however, the allegations in the Amended Complaint at ¶¶ 83-86 that state as follows:

> 83.    During the course of the prosecution Plaintiff suffered a mental breakdown due to the stress and misery of his circumstances, was found unfit to participate in his own defense, and on February 14, 2012 was committed to the custody of the Commissioner of Mental Health at the Kirby Forensic Psychiatric Center ("Kirby"), operated by the New York State Office of Mental Health, and transferred there from Rikers Island on February 21, 2012.

---

[7] I see no support in the St. Luke's records for Dr. Raines' claim that they state that Plaintiff "told the medical staff that on a scale of 0 to 10 he considered his pain 'none'," and it appears that Dr. Raines just made that up out of whole cloth.  In any event (in the event I missed some entry that might support that statement) Dr. Raines has certainly ignored all of the multiple statements by Plaintiff of his back pain, pleuritic pain, his need to be given ibuprofen (a pain reliever), and the fact that the records state that Plaintiff reported / was assessed a 5 out of 10 on the "Pain Scale."

15

84.     Plaintiff spent approximately 6 or 7 months at Kirby, until he was deemed able to once again assist in his own defense.

85.     In approximately August or September of 2012 Plaintiff was transferred back to Rikers Island from Kirby.

86.     Plaintiff was tried before a jury and acquitted of all charges on April 5, 2013.

The allegations in this case are that it was the stress and misery of being in the custody of the New York City Department of Corrections for month after month and having false felony robbery charges hanging over his head that caused Mr. Tchatat to suffer a mental breakdown in or about January / February 2012, and for the next 6 or 7 months be deemed unable to participate in his own defense and be committed to the custody of the Commissioner of Mental Health at the Kirby Forensic Psychiatric Center.  Yet Dr. Raines does not even deem this allegation to be worthy of comment, let alone discussion.  Dr. Raines also does not note that there are inaccuracies in the statements attributed to Plaintiff by Dr. Gordon.  *See*, Plaintiff's deposition testimony (Exhibit 7 to the Rothman Decl.) at 278:10-280:14:

> MR. LAWRENCE: All right. I should have given this to you before. I have a couple of copies. This is the second – if you want to mark this TCHATAT 3, this is the report -- I have one for you guys to share, if you want. This is the Tchatat report from Dr. Murray Gordon.
> …
> Q. (By Mr. Lawrence) Mr. Tchatat, I'd like to show you what's been marked TCHATAT 3 for the purpose of this deposition, and I'll represent to you that that is an examination report that's been provided to me by your attorney pursuant to the discovery in this case.  You previously testified that you saw two different individuals while you were being evaluated prior to going to Kirby, correct?
> A. Yes.
> Q. Do you recall meeting with a doctor named Murray Gordon?
> A. I do remember the actual evaluation, but I don't remember the examiner.
> MR. LAWRENCE: All right. So you do recall speaking to the two examiners.  I'd like to direct your attention to Bates Stamp 194.
> …

16

Q. (By Mr. Lawrence) I'd like to direct your attention to -- I guess it's the second full paragraph, which begins 1/30/2012.  The last full sentence of that particular paragraph says: He does admit to walking out of the store, holding said item in his hand and removed from its protective case.  Do you recall saying that to --
…
A. No.
Q. (By Mr. Lawrence) Do you know -- you see it there. You were able to read that, though, correct?
A. Yes.
Q. So I read it correctly?
A. It wasn't coming from me. I don't know where it's coming from.

This also is in violation of the American Academy of Psychiatry and Law, "Ethics Guidelines for the Practice of Forensic Psychiatry" (Adopted May, 2005)[8], Section IV. Honesty and Striving for Objectivity, Commentary:

> Psychiatrists practicing in a forensic role enhance the honesty and objectivity of their work by basing their forensic opinions, forensic reports and forensic testimony on all available data. They communicate the honesty of their work, efforts to attain objectivity, and the soundness of their clinical opinion, by distinguishing, to the extent possible, between verified and unverified information as well as among clinical "facts," "inferences," and "impressions."  Psychiatrists should not distort their opinion in the service of the retaining party.

This was not an oversight by Dr. Raines.  Although the (incorrect) attribution of this statement to Plaintiff by Dr. Gordon was not mentioned anywhere in the amended report, it was highlighted by Dr. Raines (without noting at all that Plaintiff had denied saying it) on pages 2-3 of the original report.  Dr. Raines failed entirely to reference that this information in Dr. Gordon's report was not only unverified, but was explicitly denied by Plaintiff.[9]

---

[8] As noted above, the American Academy of Psychiatry and Law, "Ethics Guidelines for the Practice of Forensic Psychiatry" (Adopted May, 2005) is annexed to the Rothman Decl. as Exhibit 4.

[9] Some of the other information quoted by Dr. Raines from Dr. Gordon on pages 2-3 of Dr. Raines' original report also is deeply troubling, including Dr. Gordon's repeated, Kafkaesque suggestions that Plaintiff's insistence on his innocence and insistence on not entering a guilty plea

Dr. Raines, on pages 3-4 of his amended report, also cites to and quotes from, for the first time, two academic articles. However, in his quotation from these sources (and throughout the entirety of his amended report), he ignores the author's caveat (which should be obvious to anyone, be he or she a psychiatrist or a layperson) that strident people (including those with mental illnesses) sometimes have legitimately been wronged, and properly seek redress through the legal system. *See*, Paul E. Mullen, M.B.B.S., D.Sc. and Grant Lester M.B.B.S., M.M.E.D., "Vexatious Litigants and Unusually Persistent Complainants and Petitioners: From Querulous Paranoia to Querulous Behaviour", Behavioral Sciences and the Law, Behav.Sci.Law 24[10] at page 340:

> Querulous behaviour has to be separated from the over-enthusiastic, and even disruptive, pursuit of justice that remains within normal limits, or is legitimized by the social agenda being pursued.
>
> Individuals can invest inordinate amounts of time in the pursuit of claims because of the inherent complexity and manifest importance of the complaint. These we would not regard as querulous.

---

and taking his case to trial are themselves indications of irrational thinking. The quotations from Dr. Gordon there also ignored that Plaintiff's insistence that the receipt and / or the barcode for the flashdrive he had purchased in the store that day would vindicate him wound up to be entirely prescient, as the receipt wound up being located and at his criminal trial (and throughout the instant litigation) it has been undisputed that Plaintiff indeed purchased a flashdrive at the Best Buy on the date of the incident. Plaintiff's belief that finding the receipt for his purchase and / or checking the barcode on the package of what he had purchased thus would assist him in his defense was therefore not ▮▮▮▮▮ or ▮▮▮▮▮ thinking – it was completely rational, and intelligent. The problem was simply that neither Dr. Gordon (nor anyone else at that point) believed him.

[10] Paul E. Mullen, M.B.B.S., D.Sc. and Grant Lester M.B.B.S., M.M.E.D., "Vexatious Litigants and Unusually Persistent Complainants and Petitioners: From Querulous Paranoia to Querulous Behaviour," Behavioral Sciences and the Law, Behav.Sci.Law 24 is annexed as Exhibit 9 to the Rothman Decl.

Simply put, Dr. Raines at no point in either his original report or his amended report even recognized the possibility that Plaintiff actually had not stolen anything or attempted to steal anything from the Best Buy on the date of the incident, that Plaintiff was the victim of an attack by the Best Buy staff and Mr. Edmonds (and not the attacker), and that Plaintiff was wrongfully arrested and prosecuted by the Defendants, who themselves (which he would have known had he reviewed their various testimonies and written statements, of which he reviewed none) conflict with each other materially in numerous respects, and who themselves have both spoliated and fabricated vital evidence.  Dr. Raines also did not consider (which would have known had he reviewed the transcript of Plaintiff's criminal trial, which he did not) that the transcript of Plaintiff's criminal trial indicates that Mr. Tchatat had, on the eve of his trial, rejected a plea offer to a misdemeanor with a sentence of time served - and took the risk of a mandatory minimum seven year prison sentence if he had been found guilty of the robbery charges - in order to go to trial rather than plead guilty to something that he did not do.  Even from the limited materials he did review, Plaintiff's consistent insistence on his innocence throughout his deposition transcript and throughout the detailed Amended Complaint warrant not a hint of the suggestion of possibility in either Dr. Raines' original report or the amended report that Plaintiff might actually have been the victim of Defendants' misconduct.  The amended report is skewed and unreliable in its entirety, and should be precluded.

IV.     <u>Even if parts of Dr. Raines' amended report would otherwise be deemed appropriate, any probative value to the amended report is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury, and should be barred under Fed.R.Ev. 403.</u>

Under Fed.R.Ev. 403 "[t]he court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing

the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." In the current posture of this case - where the claims against the private party defendants have all been resolved, and the only remaining claims are against the Police Officer defendants - while the question of what actually occurred in the store leading up to Plaintiff's arrest by the Best Buy employees and Mr. Edmonds (an Eastern Security guard) of course remains relevant, with the resolution of the claims against all of the Best Buy Defendants and Eastern Security Defendants, however, the importance of the credibility issues concerning what actually occurred prior to Plaintiff's arrest does diminish significantly.

It is undisputed that the Police Officers (the only remaining Defendants in the case) arrived after all of that was finished, and the primary issues that remain in the case relate to the Officers' actions and omissions upon arrival at the store, whether they did or did not conspire with the Best Buy employees and Edmonds to railroad Plaintiff, and concerning their actions and omissions with regard to a number of items of evidence that have been spoliated and / or fabricated. If there is, *arguendo* (which Plaintiff asserts there is not), otherwise any propriety and probative value to any aspect of Dr. Raines' amended report, whatever probative value there may be is not only diminished with regard to the Police Officer Defendants but in addition, for the reasons outlined above, any probative value to the amended report is substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury, and should be barred under Fed.R.Ev. 403.

## **CONCLUSION**

Dr. Raines' amended expert report goes well beyond permissible expert testimony, and invades the province of the jury in opining on Plaintiff's credibility and on the ultimate issues in the case.  The report also should be precluded as scientifically invalid and unreliable under Daubert, and under Fed.R.Ev. 403.

For the foregoing reasons, Plaintiff respectfully asks this Court to preclude Defendants from relying upon Dr. Raines' amended expert report.


Dated:          New York, New York
                April 13, 2016

                                 _/S/ Jeffrey A. Rothman_____
                                 JEFFREY A. ROTHMAN, Esq.
                                 315 Broadway, Suite 200
                                 New York, New York 10007
                                 (212) 227-2980