14-CV-2385 (LGS)(GWG)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSIAS TCHATAT,

                            Plaintiff,

-against-

POLICE OFFICER; LIAM O'HARA, Shield No. 20203
and POLICE OFFICER HARRY AROCHO, Shield No. 24345

                            Defendants.

# MEMORANDUM OF LAW IN OPPOSTION TO PLAINTIFF'S MOTION TO PRECLUDE THE AMENDED EXPERT REPORT OF JONATHAN RAINES, M.D.

*ZACHARY W. CARTER*
*Corporation Counsel of the City of New York*

    *Attorney for Defendants Liam O'Hara and Harry Arocho*
    *100 Church Street*
    *New York, N.Y. 10007*

    *Of Counsel: Ben Kuruvilla*
    *Tel: (212) 356-3513*
    *Matter No. 2014-012771*

# TABLE OF CONTENTS

| | Page |
|---|---|
| PRELIMINARY STATEMENT | 1 |
| ARGUMENT | |
|     A. Daubert Standard | 3 |
|     B. Amended Report | 4 |
|     C. Dr. Raines' Opinion is Properly Based on Review of Voluminous Record and No Personal Evaluation of Plaintiff Was Required | 5 |
|     D. Plaintiff's Assertions That Dr. Raines Misrepresented Information in His Report is Baseless | 11 |
|     E. Dr, Raines' Report is Directly Relavant and there is No Unfair Prejuduce to Plaintiff | 15 |
| CONCLUSION | 15 |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ x

| | |
|---|---|
| JOSIAS TCHATAT, | **MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFF'S MOTION TO PRECLUDE THE AMENDED EXPERT REPORT OF JONATHAN RAINES, M.D.** |
| Plaintiff, | |
| -against- | |
| POLICE OFFICER LIAM O'HARA, POLICE OFFICER HARRY AROCHO, ET AL., | 14-CV-2385 (LGS)(GWG) |
| Defendants. | |

------------------------------------------------------------------------ x

## PRELIMINARY STATEMENT

Defendants Liam O'Hara and Harry Arocho submit this opposition to plaintiff's motion to preclude the amended expert report of Jonathan Raines, M.D. Dr. Raines is a licensed physician who is board-certified in psychiatry and psychoanalysis. Plaintiff does not challenge Dr. Raines' credentials, training or expertise. Defendants retained him to render his expert opinion about the plaintiff's mental state at the time of the incident – September 20, 2011 – and how that mental state may have affected his actions on that date and affects his ability to recall the events of September 20, 2011. Defendants did not retain Dr. Raines to opine on plaintiff's alleged emotional or mental distress damages stemming from the incident or to give an opinion as to the causation for plaintiff's mental health condition.

In order to render an opinion about plaintiff's mental state at or around the time of the September 20, 2011 incident, Dr. Raines reviewed multiple and varied sources of voluminous information. These sources include multiple psychiatric evaluations and assessments of plaintiff which were conducted shortly after his arrest and while he was incarcerated in 2011 and 2012

during the underlying criminal case arising from that arrest. He also reviewed plaintiff's medical records of treatment at St. Luke's Hospital on September 20, 2011 – the date of his arrest – along with extensive records of his psychiatric condition from the Kirby Forensic Psychiatric Institute, where plaintiff was hospitalized between February 2012 and September 2012 (approximately 200 pages of records from Kirby).

In addition, Dr. Raines reviewed transcripts containing two full days of deposition testimony (over 500 pages of testimony) from plaintiff, during which plaintiff extensively testified, under oath, regarding his personal background, educational and employment history, immigration history, criminal history and mental health history, including experiences with ▬▬▬▬ ▬▬▬▬▬▬▬▬▬▬ and prior treatment for those disorders leading up to and following the date of his arrest. It is from his review of these extensive records that Dr. Raines formulated his opinion about plaintiff's mental health condition on September 20, 2011 and thereafter.

Contrary to plaintiff's assertions, Dr. Raines is entitled to rely on these records in formulating his expert opinion and this is consistent with accepted practice. The fact that Dr. Raines did not meet personally with plaintiff does not render his expert opinion or report objectionable or warrant preclusion under Daubert. Medical experts are entitled to base their opinion on a review of available records when appropriate. This is especially true here where Dr. Raines' report does not relate to the issue of plaintiff's alleged mental health damages arising from this incident or opine on causation for plaintiff's emotional or mental distress damages. Rather, his opinion is specifically targeted and focused on plaintiff's mental health condition on September 20, 2011 and how that affected his actions that day and affects his ability to recall those events now. Accordingly, the Court should deny plaintiff's motion to preclude the report.

# ARGUMENT

## A. Daubert Standard

In Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579 (1993), the Supreme Court stated that before admitting evidence under Rule 702, the trial judge is required to ensure that the scientific testimony or evidence is both reliable and relevant. Id. at 589. The court must assess whether the expert's opinion is grounded in "methods and procedures of science," whether it consists of more than simply "subjective belief or unsupported speculation", id. at 589, and "whether the reasoning or methodology underlying the testimony is scientifically valid and . . . properly can be applied to the facts in issue." Id. at 592-93.

The Second Circuit has adopted a flexible interpretation of Daubert. In Borawick v. Shay, 68 F.3d 597, 610 (2d Cir. 1995), the court explained that:

> [B]y loosening the strictures on scientific evidence set by Frye, Daubert reinforces the idea that there should be a presumption of admissibility of evidence. Second, it emphasizes the need for flexibility in assessing whether evidence is admissible. Rather than using rigid "safeguards" for determining whether testimony should be admitted, the Court's approach is to permit the trial judge to weigh the various considerations pertinent to the issue in question. Third, Daubert allows for the admissibility of scientific evidence, even if not generally accepted in the relevant scientific community, provided its reliability has independent support. Finally, the Court has expressed its faith in the power of the adversary system to test "shaky but admissible" evidence and advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable.

Borawick, 68 F.3d at 610 (internal citations omitted).

Moreover, in Kumho Tire v. Carmichael, 526 U.S. 137 (1999), the Supreme Court emphasized that courts have "broad latitude" in deciding whether and how to apply the Daubert factors and that "the relevant reliability concerns may focus upon personal knowledge or experience." Id. at 141-150. In fact, "[i]n certain fields, experience is the predominant, if not sole, basis for a great deal of reliable expert testimony." Fed. R. Evid. 702 Advisory Committee's

3

Note (2000). The Court in Kumho Tire also stressed that the Daubert elements are not a definitive checklist and that the trial court's gatekeeping inquiry must be "flexible" and "tied to the facts of a particular case." Kumho Tire, 526 U.S. at 150; see also Heller v. Shaw Indus., Inc., 167 F.3d 146, 152 (3d Cir. 1999) ("the district court's gatekeeper role is a flexible one and . . . the factors are simply useful signposts, not dispositive hurdles that a party must overcome in order to have expert testimony admitted.").

## B. **Amended Report**

As an initial matter, plaintiff's references to Dr. Raines' earlier report are irrelevant and misleading. Defendants are relying on Dr. Raines' amended report, which was served on December 23, 2015. See Exhibit 2 to Declaration of Jeffrey Rothman, dated April 13, 2016 (hereinafter "Rothman Declaration"), Docket No. 275 (redacted version). The Court has twice before rejected plaintiff's efforts to strike this amended report. After defendants served Dr. Raines' original expert report on November 23, 2015, plaintiff sought permission from the Court to move to preclude the report on the grounds that it improperly invaded the province of the jury because it allegedly made credibility assessments regarding the plaintiff. On December 9, 2015, Magistrate Judge Gabriel Gorenstein granted plaintiff's request to file the instant motion and originally gave him until January 11, 2016 to file. In the interim, on December 23, 2015, in an attempt to avoid motion practice, defendants served the current amended expert report, removing the items plaintiff cited in his December 3, 2015 letter as objectionable. In response, on December 29, 2015, plaintiff sought to strike the amended report on the grounds that it was served after the original expert deadline. See Docket No. 245. Judge Gorenstein denied this request on December 31, 2015. Plaintiff filed objections to this ruling on March 14, 2016. See

4

Docket No. 265. On March 16, 2016, Judge Lorna Schofield overruled plaintiff's objections to Judge Gorenstein's order allowing plaintiff to serve the amended report. See Docket No. 267.

Accordingly, Dr. Raines' amended report is the operative report at issue. Plaintiff's references to the original report, and the sections of it that were removed in response to plaintiff's earlier objections, are irrelevant.

### C. Dr. Raines' Opinion is Properly Based on Review of the Voluminous Record and No Personal Evaluation of Plaintiff Was Required

The crux of plaintiff's Daubert motion is that Dr. Raines did not personally evaluate plaintiff before rendering his expert opinion and providing his report. See Plaintiff's Motion at pages 9-14, Point II. This argument is misplaced. Such an in-person evaluation would have likely been required if defendants had retained Dr. Raines to opine on whether plaintiff has emotional or mental health damages (i.e., anxiety, depression, other psychological disorder) resulting from the incident in this case or to opine on whether plaintiff continues to have psychological damages from the incident in this case. In that instance, an in-person evaluation to determine plaintiff's current psychological condition, and whether that condition can be attributed to defendants' conduct, would be likely expected. Another example occurs in the criminal setting where a psychiatrist is retained to assess whether a criminal defendant is currently fit to stand trial. In that scenario, it would be difficult to imagine how the psychiatrist could make such an assessment without conducting an in-person evaluation to determine plaintiff's current state of mind. Indeed, when plaintiff in this case was a criminal defendant in

5

2011 and 2012, he was personally evaluated by a number of psychiatrists in order to determine if he was fit to stand trial.[1]

However, defendants did not retain Dr. Raines to provide an opinion in any of those areas and his report does not address them. Dr. Raines did not opine on plaintiff's alleged mental health damages in this lawsuit. See Amended Report, Exhibit 2 to Rothman Declaration. Rather, defendants retained him to provide his professional medical opinion on plaintiff's mental health condition around the time of his September 20, 2011 arrest, how that condition may have affected his conduct that day and how it affects his ability to recall the events from the day. Id.

Contrary to plaintiff's false assertions, Dr. Raines reviewed a voluminous record to render his opinion. The records included two (2) full days of plaintiff's testimony, medical records from September 20, 2011 and mental health records from extensive psychological evaluations of plaintiff made over 9 months between 2011 and 2012 while plaintiff was incarcerated during his underlying criminal case. These records provide extensive information about plaintiff's personal background, criminal history and his mental health history leading up to, including, and following September 20, 2011. These materials provided ample information from which Dr. Raines could formulate his opinion about plaintiff's mental health condition on September 20, 2011.

Since Dr. Raines was rendering an opinion about plaintiff's mental health condition from 2011-2012 – which is about 4 years prior to when Dr. Raines gave his opinion - a review of available records dating from that prior time period is appropriate and consistent with accepted methods and principles. See Nicks v. U.S., 955 F.2d 161, 165 (2nd Cir. 1992). In Nicks, a

---

[1] As will be noted further below, Dr. Raines relied, in part, on the voluminous records of those very psychiatric evaluations of plaintiff in 2011 and 2012 when rendering his opinion in this case about plaintiff's mental condition at the time of his arrest and incarceration in 2011 and 2012.

6

criminal defendant filed an appeal of his 1974 conviction in 1989 on the grounds that the lower court did not conduct a competency hearing before accepting the defendant's guilty plea. Id. at 164. The defendant challenged whether he was competent to understand the charges against him in 1974 and therefore whether he was capable of accepting a plea. Id.

In connection with his appeal, the government employed a forensic psychiatrist to evaluate whether defendant was competent at the time of his plea in 1974-1975. Id. at 165. In order to render the opinion, the psychiatrist reviewed *only* the documentary record from 1974-1975 and also reviewed the criminal defense attorney's affidavit. Id. Based on only a review of these documents, and without any indication of a personal evaluation, the expert psychiatrist found that the defendant was competent in 1974-1975, specifically finding that the defendant "had a rational as well as factual understanding of the charges and the proceedings against him and . . . he was able to assist counsel in his defense properly and rationally." Id. Like Dr. Raines, the psychiatrist in Nicks rendered an expert psychological opinion about a person's psychological profile from an earlier time period in order to assess that person's mental health as of the specific time period in question. Like Dr. Raines, he did so by reviewing records from the relevant time period and without conducting an in-person evaluation.

In Capellupo v. Nassau Health Care Corp., 2009 U.S. Dist. Lexis 50523 (E.D.N.Y. June 16, 2009), the plaintiff brought a Section 1983 claim against Nassau Health Care Corporation and certain doctors on the grounds that they had involuntarily committed him as a psychiatric patient at Nassau University Medical Center (NUMC) for two weeks in violation of his rights under the First, Fourth and Fourteenth Amendments. Id. at *1. In that case, police responded to the plaintiff's 911 call where he reported that he had been burglarized. Id. at *4. During the course of their investigation, the officers determined that the plaintiff may have been a danger to

himself and others because he appeared delusional and the officers observed a rifle in his closet. Id. at *6. He was transported to NUMC where he was interviewed by at least three psychiatrists, who plaintiff later named as defendants, all of whom diagnosed plaintiff as suffering from paranoia and a delusional disorder. Id. at *7-9. As a result, he was committed at NUMC for sixteen days. Id. at *9-10. After plaintiff brought his lawsuit, defendants introduced expert testimony from a board-certified psychiatrist. Id. at *10. The psychiatrist did not evaluate plaintiff, but instead formed an opinion based on review of the available medical records and transcripts, including the evaluations conducted by the defendant psychiatrists who had evaluated plaintiff at NUMC. The expert's final opinion concluded that:

> [Plaintiff] did not have any insight into his delusions and began acting on them when he called 911 on 9/13/05. The fact that he acted out on the delusion is a sign that he was becoming more frustrated and more angry which is an indication that he is acting out impulsively. [Plaintiff] remained convinced that the delusions were real and could not be swayed from his fixed illogical ideas. This is a sign of psychiatric illness, delusional paranoia which required medical intervention to prevent [plaintiff] from harming himself or others

Id. at *10. The expert formed this medical opinion without having evaluated the plaintiff and his opinion was based only upon a review of the available records. The Court credited the defendants'' expert's testimony and plaintiff's case was dismissed on summary judgment.

The Nicks and Capellupo decisions reflect that experts in psychiatry, depending on the facts of the case and the nature of the opinion they are retained to provide, may rely exclusively on a review of available records, even where an examination could have been arranged as well. Here, Dr. Raines' opinion was drawn from (1) the extensive records regarding plaintiff's mental health status from on or around September 20, 2011, (2) plaintiff's own testimony about the events of September 20, 2011 and (3) plaintiff's statements to the psychiatrists who evaluated him around that time as well. As in Capellupo and Nicks, the reliance by Dr. Raines on medical

8

records review in a scenario such as in this case is recognized and accepted in the field of forensic psychiatry. As in <u>Nicks</u>, Dr. Raines was brought on to render an opinion about plaintiff's mental health status from an earlier period of time and how that condition may have impacted his conduct at that earlier given time. There is no bright line rule that required Dr. Raines, given the scope of the opinion he provided in this case, to personally meet plaintiff before rendering that opinion, when the necessary and relevant information was contained in the available records.

The American Academy of Psychiatry and Law, "Ethics Guidelines for the Practice of Forensic Psychiatry", attached as Exhibit 4 to the Rothman Declaration, which plaintiff cites in his motion, indicates that not every psychological evaluation requires a personal examination. <u>See</u> Exhibit 4 to Rothman Declaration at page 4. The guidelines provide that there are certain types of evaluations, such as a medical records review for a malpractice case, where such an evaluation is not needed. <u>Id.</u> ("For certain evaluations, such as record reviews for malpractice cases, a personal examination is not required"). The guidelines do not provide an exhaustive list of all the types of evaluations where a personal examination is preferred. Rather, this is a case-by-case determination and is dependent on the needs of the particular case and the type of opinion being issued. As in the <u>Nicks</u> and <u>Capellupo</u> cases, Dr. Raines' opinion was based on a thorough review of the available medical records from the 2011-2012 timeframe in order to assess plaintiff's condition at that time.

A summary of the records reviewed include the following:

- Dr. Raines reviewed the two full days (approximately 14 hours) of deposition testimony from plaintiff, which was taken on October 7, 2015 and October 21, 2015, respectively (about 530 pages of testimony). In that testimony, plaintiff provided extensive detail about his

9

background, including his educational and employment history, stretching from his youth in Cameroon, Africa, to his immigration to the United States, including his residency in Iowa and New York. In addition to his educational and employment history, plaintiff testified extensively about various matters, including his housing status, family members who he has lived with, his criminal history and his mental health history. Plaintiff went into extensive detail about his mental health history, detailing ▮▮▮▮ and ▮▮▮▮ that he has experienced every year since 2009. Plaintiff described these ▮▮▮ as ▮▮▮ in nature where he felt ▮▮▮▮▮▮. In addition, plaintiff detailed his medication history, describing the ▮▮▮ he has taken to treat his ▮▮ and ▮▮ since at least a year prior to the September 2011 incident, including periods of time when he has not taken his ▮▮ medication. Specifically, plaintiff testified that he was not taking medication at the time of his encounter with security guards at Best Buy in September 2011. Dr. Raines specifically noted this in his report. Plaintiff also detailed his ▮▮▮ as well in his testimony. Finally, plaintiff testified extensively about the events of September 20, 2011.

- In addition to the deposition testimony, Dr. Raines reviewed psychiatric examination reports of plaintiff from multiple sources. He reviewed reports from Murray A. Gordon, M.D., a psychiatrist affiliated with the Forensic Psychiatry Clinic of Bellevue Hospital Center, who conducted a psychiatric evaluation of plaintiff on January 12, 2012, subsequent to his arrest and while he was incarcerated in this case. Dr. Raines also reviewed the report of Ankur Saraiya, M.D., Diplomate of the American Board of Psychiatry and Neurology. Both psychiatrists diagnosed plaintiff as having a ▮▮ and the examinations revealed, among other things, that plaintiff was ▮▮ just prior to his arrest in September. Dr.

10

Raines referenced his review of these examinations and the psychiatrists' conclusions in his report. See Exhibit B and C, attached to the Declaration of Ben Kuruvilla Declaration, dated May 6, 2016.

- Plaintiff was hospitalized at Kirby Forensic Psychiatric Center from February 2012 until September 2012. Dr. Raines reviewed the approximately 200 pages of records from Kirby relating to plaintiff's treatment and psychiatric evaluations at Kirby over this 6 month period, including progress notes on plaintiff's condition. Dr. Raines referenced this review in his report as well. (Due to the voluminous nature of these records, they will not be attached as exhibits). In addition, Dr. Raines also reviewed plaintiff's records from St. Luke's Emergency Department from the date of his arrest, September 20, 2011 and medical records from the New York City Department of Health and Mental Hygiene between September 21, 2011 and February 21, 2012, which was when plaintiff was incarcerated at Riker's Island.

Indeed, Dr. Raines had a significant amount of source material upon which to base his conclusions about plaintiff's mental health status and history at the time of the incident on September 20, 2011, including the reports of numerous psychiatric professionals who evaluated plaintiff during the relevant time periods and plaintiff's own extensive recounting of his mental health condition over two days at his deposition. Accordingly, Dr. Raines' opinion was well-founded, based on a thorough review of records, based on accepted principles and methods and is reliable.

### D. Plaintiff's Assertions that Dr. Raines Misrepresented Information in His Report is Baseless

Plaintiff alleges in his motion that Dr. Raines misrepresented information and failed to review all information available to him. As an example, plaintiff notes that Dr. Raines did not review the defendants' deposition testimony, including the testimony of the Best Buy security

11

guard personnel or the police officer defendants. See Plaintiff's Motion at pp. 4-5. Plaintiff fails to explain how a review of the defendants' testimony would shed any light on the plaintiff's mental health condition on September 20, 2011 or any subsequent date – which is the subject of Dr. Raines' report. Plaintiff's assertion that Dr. Raines misrepresented information from the records is pulled from whole cloth and is just plain false. For example, plaintiff cites to the portion of Dr. Raines' report where he noted that plaintiff testified that he "███████ constantly, almost on a daily basis." See Plaintiff's Motion at p. 14. Plaintiff argues in his motion that this was a misrepresentation. In fact, it is not. Plaintiff specifically testified that he had ███████ many times and practically every day, which is precisely what Dr. Raines noted in his report. Plaintiff's testified as follows at his deposition:

> Q. Okay. Did you experience ███████ of any sort, visual or audible, between October 2010 and the time of your arrest, September 2011.
>
> A. Yes.
>
> Q. When did you experience those ███████?
>
> A. A number of times.
>
> . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .
>
> Q. Yeah, how often between October 2010 and the date of the incident in this case, September 20, 2011, did you experience ███████ of any sort?
>
> A. A number of times.
>
> Q. When I say how often, I'm asking whether you experienced this daily, weekly, monthly?
>
> (Objection to form)
>
> A. Every day, most days

12

See Plaintiff's Deposition, Volume 1, October 7, 2015, at p.121:2 – 8; p.121:18-122:9, attached as **Exhibit A** to Kuruvilla Declaration.

Further, plaintiff could not remember if he had ▮▮▮▮▮ on September 20, 2011:

> Q. Do you know if you experienced those ▮▮▮▮▮ on that date, September 20, 2011.
>
> A. Not that I remember.

See Plaintiff's Deposition, Volume I, at p. 119:5-8, see **Exhibit A** to Kuruvilla Declaration. Dr. Raines' references to plaintiff's deposition testimony was 100% accurate and plaintiff's assertions otherwise are false.

Next, plaintiff argues that Dr. Raines misrepresented information in the medical records from St. Luke's Hospital. Plaintiff's argument is completely without merit and unsupported by the records. Dr. Raines notes in his report that the records from St. Luke's reflect "no evidence whatsoever of any physical trauma to any part of his body" and that plaintiff reported to the medical staff that on a scale of 0 to 10, he considered his pain level to be "none". See Amended Report, attached as Exhibit 2 to Rothman Declarataion, at p. 2. Plaintiff argues that his was a misrepresentation. See Plaintiff's Motion at p. 15. It is not. Nowhere in the St. Luke's records is there any evidence of actual physical trauma to any part of plaintiff's body. See St. Luke's Medical Records, attached to Rothman Declaration at Exhibit 8. While plaintiff reported to the staff at St. Luke's that he was assaulted, and there is no dispute that he made such a report, the St. Luke's medical records note no evidence of trauma (i.e., no cuts or bruises, no fractures, etc.). See Exhibit 8 to Rothman Declaration. Furthermore, there is indeed a specific notation in the medical records that on a scale of 0 to 10, plaintiff reported "none" as his pain level. See id. at p.

13

Bates No. 00136. Again, plaintiff's allegation that Dr. Raines misrepresented the records is simply false or meritless.

Plaintiff argues that Dr. Raines should have considered in his report that the criminal charges against plaintiff were false and that the stress of this reality is what actually caused his mental breakdown. See Plaintiff's Motion at p. 16. This argument is nonsense. First, it fails to acknowledge that plaintiff himself reported, both in his deposition and in the extensive psychiatric records, that he suffered from ▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮ of a ▮▮▮▮▮ nature *prior to* September 20, 2011, and also leading up to his arrest and thereafter. See Excerpts from plaintiff's deposition attached as **Exhibit A** to Kuruvilla Declaration. Plaintiff himself reported that he sought out treatment for these issues prior to September 20 and was prescribed medication for them. Second, plaintiff's argument assumes that Dr. Raines' report is unreliable unless he adopts and credits plaintiff's version of events. Dr. Raines considered the totality of the extensive psychiatric records – both before and after September 20, 2011 - in drawing his conclusions and forming his opinion. Plaintiff cites to no law or support for the contention that Dr. Raines must credit plaintiff's allegations before issuing his opinion.

Plaintiff continues this frivolous argument further on his motion. Plaintiff cites to the portion of his deposition where he was confronted with a summary of an interview he had with Dr. Murray Gordon during a psychiatric examination in January 2012. See Plaintiff's Motion at p. 16-18. The notes indicate that plaintiff told Dr. Gordon that he admitted to walking out of the Best Buy store on the date of the incident, holding an item that had been removed from its protective case. Id. Plaintiff was confronted with this report at the deposition and he denied making the statement to Dr. Gordon. Id. Plaintiff argues that because he now denies making this statement to Dr. Gordon in January 2012, Dr. Raines should have therefore noted in his opinion

that Dr. Gordon's report was inaccurate. In so arguing, plaintiff again assumes, without any support, that Dr. Raines must fully credit plaintiff's version of events, in order to render an opinion about plaintiff's psychological condition on September 20, 2011.

### E. Dr. Raines' Report is Directly Relevant and there is No Unfair Prejudice to Plaintiff

Dr. Raines' report relates directly to the mental condition plaintiff was suffering from at the time of the incident. According to the report, that condition had a direct impact on plaintiff's conduct and informs his motivations on the date of the incident. There is no question that plaintiff's conduct and motivations on September 20, 2011 are directly relevant to plaintiff's claims and defendants' defenses. Plaintiff has not articulated any unfair prejudice that would result from admission of Dr. Raines' report or testimony. If by "unfair prejudice" plaintiff means that the Dr. Raines' opinion and report are not favorable to plaintiff, this does not meet the Rule 403 standard.

## CONCLUSION

The Court should exercise its "gatekeeper" function to deny plaintiff's motion to preclude Dr. Raines' report and require, if he so desires, that plaintiff obtain an expert to rebut the findings and conclusions made by Dr. Raines. Plaintiff does not challenge Dr. Raines' credentials, training or experience. Plaintiff has made no showing that the report was based on unreliable principles or methodology. Dr. Raines' report is directly relevant to the issues in this case.

As detailed above, Dr. Raines reviewed voluminous materials – containing extensive information about plaintiff's background and mental health history - which specifically relates to the relevant time period for his opinion. Those records included conclusions from multiple mental health professionals who examined him at or around the time of his arrest in September 2011 and discussed the circumstances of the incident with plaintiff (including 200 pages of

records from Kirby Institute and extensive reports by two qualified psychiatrists). Those records also included over 500 pages of deposition testimony detailing all aspects of plaintiff's background, mental health history and the events of September 20, 2011. Dr. Raines was entitled to draw his conclusions based on a review of those extensive materials. Dr. Raines' decision not to examine plaintiff was not erroneous, was appropriate given the facts of this case and was consistent with accepted practice.

If plaintiff disagrees with Dr. Raines conclusions and wishes to rebut them, he should be compelled to hire a rebuttal expert. Accordingly, the Court should deny plaintiff's motion.

Dated: New York, New York
May 6, 2016

ZACHARY W. CARTER
Corporation Counsel
  of the City of New York
*Attorney for Defendants*
LIAM O'HARA and HARRY AROCHO
100 Church Street
New York, New York 10007
(212) 356-2331
bkuruvilla@law.nyc.gov

By: _____/s/_____
Ben Kuruvilla
*Senior Counsel*
Special Federal Litigation Division