UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------X
JOSIAS TCHATAT,                                        )
                                                       )
                              Plaintiff,               )
                                                       )
        -against-                                      )
                                                       )        **14 Civ. 2385 (LGS)**
THE CITY OF NEW YORK; POLICE OFFICER    )
LIAM O'HARA, Shield No. 20203; POLICE        )
OFFICER HARRY AROCHO, Shield No. 24345;   )
JOHN DOES; RICHARD ROES; BEST BUY CO., )
INC., d/b/a BEST BUY CO. OF MINNESOTA;     )
SHWON EDMONDS; RICHARD CASTELLANO;)
VAN MOBLEY; JESSE KEMPEN; JESSICA         )
DELESTIN; IAN PALMER; EASTERN                )
SECURITY CORP.; SAMUEL J. VOTTA;             )
ISIDORE CALECA; and MICHAEL MOES,          )
                                                       )
                              Defendants.               )
---------------------------------------------------------X


**PLAINTIFF'S OBJECTIONS, PURSUANT TO FED.R.CIV.P. 72, TO
MAGISTRATE JUDGE GORENSTEIN'S APRIL 14, 2017 OPINION AND ORDER
[docket entry # 331], WHICH DENIED PLAINTIFF'S APPLICATION FOR
SPOLIATION SANCTIONS**


Jeffrey A. Rothman, Esq.
315 Broadway, Suite 200
New York, New York 10007
(212) 227-2980

Attorney for Plaintiff Josias Tchatat

TABLE OF AUTHORITIES

Bradley v. Jusino, 2009 WL 1181617 (SDNY) ………………………………… 12

Brady v. Maryland, 373 U.S. 83 (1963) …………………………………………… 12

Broughton v. State of New York, 37 N.Y.2d 451 (1975) ………………………….. 17

Casale v. Kelly, 710 F. Supp. 2d 347 (S.D.N.Y. 2010) ………………………… 16

Colon v. City of N.Y., 60 N.Y.2d 78 (N.Y. 1983) …………………………...………. 11

DeMeo v. Kean, 754 F. Supp. 2d 435 (N.D.N.Y. 2010) ……………………..…... 9

Doe v. Norwalk Comm. College, 248 F.R.D. 372 (D. Conn. 2007) …………..…… 3

Easley v. Cromartie, 532 U.S. 234 (2001) …………………………………….……… 2

Jocks v. Tavernier, 316 F.3d 128 (2d Cir. 2003) …………………………………….. 11

Kerman v. City of New York, 261 F.3d 229 (2d Cir. 2011) ………....…………. 11

Kronisch v. U.S., 150 F.3d 112 (2d Cir. 1998) ……………………………………….. 9, 15

Kuehl v. Burtis, 173 F.3d 646 (8th Cir. 1999) ……………………..……………… 12

Manganiello v. City of New York, 612 F.3d 149 (2d Cir. 2010) …..……………. 7

Mitchell v. City of New York, 841 F.3d 72 (2d Cir. 2016) ……………………….. 11

Novick v. AXA Network, LLC,
2014 U.S. Dist. LEXIS 150004 (S.D.N.Y. 2014) ……..………………………… 8

Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec.,
685 F.Supp.2d 456 (S.D.N.Y. 2010) ………………………………………………… 8

People v. Ingram, 143 A.D.2d 448 (N.Y. App. Div. 3d Dep't 1988) …..………… 16

People v. Oquendo, 134 A.D.2d 203 (N.Y. App. Div. 1st Dep't 1987) ………….. 15

Residential Funding Corp. v. DeGeorge Financial Corp.,
306 F.3d 99 (2d Cir. 2002) ……………………………..…………….……... 16

R.F.M.A.S., Inc. v. So, 606 F. Supp. 2d 497 (S.D.N.Y. 2009) ……………………. 8

Russo v. City of Bridgeport, 479 F.3d 196 (2d Cir. 2007) ………………………...… 11

<u>Sekisui Am. Corp. v. Hart</u>, 15 F. Supp. 3d 359 (S.D.N.Y. 2014) …………..…….. 19

<u>Smith-Hunter v. Harvey</u>, 95 N.Y.2d 191 (2002) ………………………………… 17

<u>Taylor v. City of N.Y.</u>, 293 F.R.D. 601 (S.D.N.Y. 2013) ………..……..…..  5-7, 19

<u>Tennison v. City and Cty. Of San Francisco</u>,
2006 WL 733470 (N.D.Cal. 2006) ………………………………………………… 4

<u>Treppel v Biovail Corp.</u>, 249 FRD 111 (S.D.N.Y. 2008) …………...…………….. 15

<u>Turner v. Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68 (S.D.N.Y. 1991) …..……… 18

<u>Zubulake v. UBS Warburg LLC</u>, 220 FRD 212 (S.D.N.Y. 2003) ……………….... 18

<u>Zubulake v. UBS Warburg LLC</u>, 229 F.R.D. 422 (S.D.N.Y. 2004)……………….. 8

Plaintiff has brought claims pursuant to 42 U.S.C. § 1983, stemming, *inter alia*, from his arrest by Defendant NYPD Police Officers O'Hara and Arocho (hereafter referred to as "the Officers") for allegedly perpetrating a robbery on September 20, 2011, and his imprisonment over the next 563 days until he was acquitted of all charges on April 5, 2013.  Plaintiff sought sanctions against these Defendants stemming from their spoliation of a number of items of evidence.[1]  *See*, Plaintiff's motion papers at docket #s 311-13; Defendants' opposition papers at docket #s 324-325; and Plaintiffs' reply papers (docket #s 326-327, which also incorporated Plaintiff's motion papers in opposition to Defendants' motion for summary judgment and in support of Plaintiff's cross-motion to reinstate his Monell claims, docket #s 320-323, which supplied additional facts and evidence beyond those relied upon in the Plaintiff's original spoliation motion papers).[2]  Judge Gorenstein, by Opinion and Order dated April 14, 2017 (docket # 331) (hereafter referred to as the

---

1 Spoliation sanctions were also sought against the City of New York - if Your Honor reinstates Plaintiff's Monell claims pursuant to Plaintiff's pending motion (docket # 320) - stemming from the City of New York's policies and practices of failing to properly train its police officers concerning evidence preservation.  The claims against the other parties to this litigation have all been settled.

2 The facts relied upon on the original spoliation motion were supplied as Facts #s 1-61 in the Statement of Facts in Plaintiff's memorandum of law (docket # 312).  All of these facts were used (with different numbering), and were supplemented with further facts, in ¶¶ 51- 142 of Plaintiff's Response to Defendants' Statement Pursuant to Local Rule 56.1 (docket # 322) (hereafter "Pl. 56.1 Cntrstmnt").  These facts will not be reproduced again in the instant Objections, and the Court is respectfully referred to ¶¶ 51- 142 of docket # 322 for the facts and evidentiary citations applicable to the instant Objections.  Judge Gorenstein disregarded a number of the facts pertinent to the spoliation application, some of which are discussed below.  Plaintiff had initially sought to bring his spoliation application before Your Honor (*see*, docket # 293), as it sought, *inter alia*, dispositive relief (*i.e.*, to have Defendants' answers stricken), and because the facts and issues overlapped with those which Your Honor would be adjudicating concerning Defendants' pending motion for summary judgment.  Your Honor ordered that the motion be heard by Judge Gorenstein (*see*, docket # 295).

1

"Opinion") denied Plaintiff's motion in its entirety.  The instant objections, pursuant to

Fed.R.Civ.P. 72, are taken from that April 14, 2017 Opinion.

This Court should hold that Judge Gorenstein's Opinion is both clearly erroneous[3] and

contrary to law.  The Opinion held that arresting police officers have no duty to seek to preserve

evidence concerning an arrest they have made for serious felony charges, even in circumstances

where they have taken critical evidence into their custody (such as the memory card packaging that

Plaintiff was accused of having torn open, which Officer O'Hara returned to the Best Buy store, and

the cell phone photograph(s) that O'Hara took of security guard Shwon Edmonds' face, that were

subsequently lost along with O'Hara's phone), because they were not sufficiently on notice that

their arrest and prosecution of Plaintiff might lead to a lawsuit.

Judge Gorenstein was in error, and Officers O'Hara and Arocho should be sanctioned for

their spoliation of: (1) the cell phone photograph(s) of Shwon Edmonds' face that O'Hara took

with his personal cell phone, which O'Hara never vouchered or otherwise preserved and then lost

the phone; (2) Edmonds' eyeglasses, which were never taken into police custody, despite their

allegedly having been damaged when Plaintiff allegedly head-butted Edmonds and caused some

alleged injury to Edmonds' face; (3) the memory card packaging that Plaintiff allegedly had

ripped open and left in the store's bathroom, which O'Hara has testified he took from the store to

the police precinct, photographed at the precinct, and then returned to the Best Buy store (from

which point this critical evidence went missing, and there is no documentation at all of it even

---

3 An order is clearly erroneous if the reviewing court is "left with the definite and firm
conviction that a mistake has been committed."  *See*, Easley v. Cromartie, 532 U.S. 234, 242
(2001) (internal citation and quotation marks omitted).

having been returned to the store as O'Hara claims); (4) the memory card itself (concerning which O'Hara could not recall if it was or was not given to him[4], or if it was still in the packaging), which – according to the store employees' varying narratives – was either recovered from Plaintiff's pocket in the security room, or fell from Plaintiff's pocket to the floor in the security room, or was taken by Plaintiff from his pocket and thrown to the floor in the security room; and (5) video footage from the store's video cameras, which the Best Buy staff had used to specifically track Plaintiff with and which footage (some of which having been specifically denoted as relating to Plaintiff in Best Buy's incident report) was not reviewed or taken into custody by the Officers.

As an initial matter, it was error for Judge Gorenstein to hold that the Officers were not on notice that these items of evidence may be relevant to future litigation.  First, the officers certainly should have been aware that these items of evidence were of relevance in the prosecution that would stem from the arrest that they were making, which Officer O'Hara initiated by signing the Criminal Court Complaint, and participated in throughout (including giving testimony at both the grand jury and the criminal trial, and through a number of communications with the District Attorney's office).  *See, e.g.,* Doe v. Norwalk Comm. College, 248 F.R.D. 372, 377-78 (D. Conn. 2007) ("the defendants should not have 'scrubbed' Masi's computer after his resignation because of the state criminal investigation against him"). In the context of civil rights litigation, given the foreseeability of § 1983 claims and habeas petitions that often follow on the heels of criminal prosecutions, courts have found a duty to preserve based on the reasonable foreseeability of a

---

4 Security Guard Shwon Edmonds has testified that he gave the memory card itself to the Officers.  *See*, Pl. 56.1 Cntrstmnt ¶ 128.

3

criminal prosecution. *See, e.g.,* <u>Tennison v. City and Cty. Of San Francisco</u>, 2006 WL 733470,

*38 (N.D.Cal. Mar. 22, 2006), *aff'd*, 548 F.3d 1293 (9th Cir. 2008).  Secondly, it is common

knowledge (particularly among police officers) that many arrests and prosecutions lead to civil

lawsuits.  I cited a newspaper article that was illustrative of the obvious fact that every member of

the NYPD is of course aware that a large number of lawsuits are filed by arrestees stemming

from their arrests and prosecutions each year.  *See*, e.g., article by Rocco Parascandola, <u>Police</u>

<u>Union Chief Wants New York to Adopt No-Settlement Policy to Stop 'Quick Buck' Civil</u>

<u>Lawsuits</u>, N.Y. Daily News (September 29, 2014) (describing a letter sent to the Corporation

Counsel by the President of the Patrolman's Benevolent Association in response to a Daily News

report that stated "that the number of claims against the NYPD doubled over the past decade, to a

record high of 9,570 filed in 2012" and that "[t]he suits cost taxpayers more than $1 billion

during the 10-year period."), viewable at <u>http://www.nydailynews.com/new-york/union-chief-</u>

<u>city-adopt-no-settle-policy-article-1.1956680</u>.  Judge Gorenstein rejected the proposition that the

Officers were on notice that their arrest and prosecution of Plaintiff might lead to litigation, and

cited in his Opinion to statistics showing that compared to the total number of arrests made every

year, the number of lawsuits is relatively small.  But showing a close proportion of arrestee

lawsuits as compared with the total number of arrests in the City is not the standard, and the

absence of such a close proportion is not a fact that is relevant to the spoliation analysis.

It may well be, for example, that people only sue property owners in a small percentage of

circumstances where they slip and fall, but the owners of property are considered to be on notice

of their obligation to preserve evidence in such circumstances, because it is common knowledge

that such circumstances often lead to litigation (regardless of how often statistically that occurs in

relation to the total number of slips and falls).  *See*, e.g., Taylor v. City of NY, 293 F.R.D. 601, 610-611 (S.D.N.Y. 2013):

> In analogous situations where a party has knowledge that certain types of incidents tend to trigger litigation, courts within the Second Circuit have found that a duty to preserve relevant video footage may attach as soon as the triggering incident occurs and prior to when a claim is filed. For example, the court in Slovin v. Target Corporation, No. 12 Civ. 863 (HB), 2013 U.S. Dist. LEXIS 31858, 2013 WL 840865, (S.D.N.Y. Mar. 7, 2013), ruled that the obligation to preserve video footage of a customer's fall in a Target store attached "at the time of the accident" because "Target was undoubtedly aware immediately following the fall that the video would likely be relevant to future litigation." 2013 U.S. Dist. LEXIS 31858, [WL] at *3. As is particularly relevant to the present case, the Slovin Court reached its decision after considering that Target only saved video recordings for thirty days from the date of creation and the plaintiff had filed her lawsuit approximately four months after the incident in question. Id.
>
> Similarly, the court in Matteo v. Kohl's Department Stores, Inc., No. 09 Civ. 7830 (RJS), 2012 U.S. Dist. LEXIS 32193, 2012 WL 760317, (S.D.N.Y. Mar. 6, 2012), found that—even though an injured plaintiff had waited ten months before filing a claim and despite the fact that the defendants only retained video surveillance footage for sixty days—"there [was] little doubt that, at the time of the accident, [d]efendants could have expected [p]laintiff to file a lawsuit." 2012 U.S. Dist. LEXIS 32193, [WL] at *3, aff'd, 533 Fed. Appx. 1, 2013 U.S. App. LEXIS 14094, 2013 WL 3481365, at *2 (2d Cir. July 12, 2013); see also Simoes v. Target Corp., No. 11 Civ. 2032 (DRH), 2013 U.S. Dist. LEXIS 83896, 2013 WL 2948083, at *3 (E.D.N.Y. June 14, 2013) (holding that the duty to preserve video surveillance footage attached "[o]n the same day as the incident [because] Target had knowledge of the [plaintiff's] slip and fall, . . . and [also knew] that there was liquid on the floor where plaintiff fell"); Siggelko v. Kohl's Dep't Stores, Inc., No. 06 Civ. 2281 (JS), 2009 U.S. Dist. LEXIS 21223, 2009 WL 750173, at *3 (E.D.N.Y. Mar. 17, 2009) ("Assuming that Plaintiff suffered some injury, Kohl's could have anticipated that Plaintiff would file a lawsuit shortly thereafter.").
>
> Accordingly, given the facts of this case and the DOC's experience with prior litigation arising from inmate on inmate assaults, it was reasonable for Defendants to have anticipated within a week of the May 24, 2011 assault that Plaintiff would initiate litigation against the DOC for failing to protect him. Defendants' duty to preserve evidence relevant to such a lawsuit by Plaintiff therefore arose prior to when the surveillance footage was deleted.

The same analysis is more than sufficient to have put the Officers on notice that Plaintiff might bring suit stemming from his arrest and prosecution, particularly where, *inter alia*, (1) the Officers arrested Plaintiff at the store where the alleged robbery had just allegedly occurred, (2) the Officers spoke with the store staff at the time of the arrest (including being present when store employee Van Mobley executed what he has admitted were perjured affidavits concerning Plaintiff's alleged activities in the store), (3) O'Hara was Plaintiff's arresting officer on the police paperwork, processed his arrest for robbery, and participated in every stage of the prosecution, (4) Plaintiff had complained to the Officers that he had been attacked and handcuffed by the store employees for no reason and was thus the victim, and not the perpetrator, of a crime, (5) the Officers had taken Plaintiff to the hospital for treatment of his injuries, (6) Edmonds, who Plaintiff allegedly had head-butted, did not receive any medical care, and (7) only Plaintiff (and not any of the store employees) was arrested stemming from the incident in the Best Buy store on the date of Plaintiff's arrest. *See*, Pl. 56.1 Cntrstmnt ¶¶ 51-87.  In the Taylor case, cited *supra*, Judge Patterson did not seek statistics as to how often inmates sue the City and its Department of Corrections employees when there is an incident of inmate-on-inmate violence in the City's jails, nor did the slip and fall cases he cited to cite statistics as to how often people sue in relation to the total number of times they slip and fall.  It was sufficient for the judge in Taylor to note that it is common for inmates to sue when they are attacked by other inmates, and in the slip and fall cases it is sufficient to note that it is common for people to sue when they slip and fall in a store. It is similarly sufficient to note that it is common for people to sue when they've been arrested and prosecuted, especially (which should not be considered necessary) in circumstances, like those in the case at bar, where an arrestee has been arrested for a serious felony offense and has

6

asserted to his or her arresting officers that he or she was the a victim of a crime and not the perpetrator.  Accordingly, both O'Hara and Arocho reasonably should have foreseen the possibility of litigation, and they therefore had an obligation to preserve these multiple items of evidence that might be relevant to that litigation (as well as to the prosecution that they initiated).

Judge Gorenstein discussed Taylor at page 10 of the Opinion, and attempted to distinguish it by stating that in Taylor "[t]he record evidence was that the Department of Corrections knew that litigation 'invariably ensued' from such assaults on inmates in Department of Corrections custody."  But this conclusion in Taylor was not based on any statistical comparison of the total number of attacks on inmates to the number of times attacked inmates had sued: it was based on a "Litigation Tracking Compilation" by the DOC which simply noted hundreds of other instances where inmates have been injured while in DOC custody, and also sued, and on a Corrections Officer's testimony that "she 'knew that inmates get beaten up by other inmates and claim that it was the [DOC]'s fault.'" Taylor at 10.  The factual distinctions between Taylor and the case at bar in terms of notice to the DOC personnel in that case, and notice to the NYPD personnel in this case, of the duty to preserve evidence are distinctions without any material difference to the spoliation inquiry.

Plaintiff also had cited to Manganiello v. City of New York, 612 F.3d 149, 166 (2d Cir. 2010) which, in a civil lawsuit, rejected as "frivolous" the contention made by the defendant police detective that he had no obligation to preserve the case file of a criminal investigation:

> The contention that [Detective] Agostini had no obligation to preserve the case file is frivolous. The case file had been committed to his custody as the leader of the investigative team, and Agostini admitted at trial that it was his responsibility to preserve the evidence until the time of trial (see Tr. 235-36; see also id. at 612

7

(similar testimony of the ADA)). Agostini's contention that the case file--which he left under his desk or on top of a locker--was not under his control amounts to no more than an inappropriate attempt to abdicate his responsibility for its preservation. Although Agostini testified at trial that he had removed the case file from a room in which such files were normally kept because that room was being "clean [ed]. . . out" (id. at 242), he gave no reason for not putting the case file in some other safe place--other than his explanation that the papers were in a box, and the box itself was too large to fit into a secure file cabinet (see id. at 241-42; (id. at 242 ("It was just too big of a box.")).

That this holding was rendered in affirming the propriety of an adverse inference instruction that the trial judge decided to give during a trial, and not as part of a ruling on a separate spoliation motion, also is a distinction that Judge Gorenstein makes (Opinion at 12) that is without a difference.  The unmet duty to preserve evidence that would lead to a judge to decide to give an adverse inference instruction during a trial is the same duty to preserve that, if unmet, would justify spoliation sanctions.  Indeed, an adverse inference instruction is one of the array of sanctions that are available to a judge with which to punish a party for spoliation of evidence.[5]

Officers O'Hara and Arocho are professional police officers.  When they make an arrest – especially, as in the case at bar, a warrantless arrest for a felony  – and initiate a felony

---

[5] "The determination of an appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge, and is assessed on a case-by-case basis." Zubulake v. UBS Warburg LLC, 229 F.R.D. 422, 430 (S.D.N.Y. 2004).  Sanctions can include a variety of measures, from "further discovery, cost-shifting, fines, special jury instructions, preclusion, and the entry of default judgment or dismissal (terminating sanctions)." Pension Comm. Of Univ. of Montreal Pension Plan v. Banc of Am. Sec., 685 F.Supp.2d 456, 469 (S.D.N.Y. 2010) (citations omitted). Where there is evidence of egregious conduct on behalf of a defendant or his / her / its attorney in connection with spoliation of evidence, the striking of the defendant's answer may be an appropriate sanction. R.F.M.A.S., Inc. v. So, 606 F. Supp. 2d 497, 499, at n. 2 (S.D.N.Y. 2009).  A party can also be awarded attorneys' fees incurred in connection with a successful motion for spoliation sanctions. See, e.g., Novick v. AXA Network, LLC, 2014 U.S. Dist. LEXIS 150004, at *22-23 (S.D.N.Y. 2014) (imposing sanctions in the form of an "adverse inference jury instruction concerning spoliated audio recordings [and] the award of the plaintiff's reasonable attorneys' fees and costs incurred in connection with the instant motion").

prosecution they have taken action of the most serious kind, which can have the gravest of consequences to the arrestee's life.  Judge Gorenstein's conclusion that the Officers had no duty to preserve the important evidence at issue on the instant motion is contrary to sound public policy, and would incorrectly have private parties be held to a higher duty to preserve evidence than professional law enforcement officers whose very jobs inherently entail the responsible collection and preservation of important evidence.  *See*, e.g., DeMeo v. Kean, 754 F. Supp. 2d 435, 448-49 (N.D.N.Y. 2010) (citing to Kronisch v. U.S., 150 F.3d 112, 126 (2d Cir. 1998) for the proposition that "while the obligation to preserve evidence most commonly arises from express notice that a claim has been filed, it may also arise 'when a party should have known that the evidence may be relevant to future litigation'," and noting that "[t]his is particularly true in the case of Reyner as a law enforcement officer.").  Judge Gorenstein points out that DeMeo involved circumstances where the police officer had (unlike in the case at bar) actually viewed the video at issue, and where there was a state court preservation order in effect.  But DeMeo was cited by Plaintiff because it properly highlights the heightened expectation that a law enforcement officer should understand that certain important evidence may be relevant to court proceedings, and that a law enforcement officer also can have a duty to seek to preserve evidence where the evidence is in the hands of a private party (in DeMeo the defendant law enforcement officer was involved, as in the case at bar, at the scene of an incident between a plaintiff and private-party defendants out of which the litigation stemmed).

The Officers certainly understood their obvious duty - as police officers making a felony arrest for robbery - to preserve relevant evidence concerning the alleged robbery.  The Officers took the memory card packaging from the store, and O'Hara vouchered as arrest evidence the

photograph he took of it along with the receipt for its value that the store staff generated for him (and then ridiculously proceeded to spoliate the packaging itself by returning it to the store). O'Hara knew it was important to document the condition of Edmonds' face, and took a photograph(s) of Edmonds' face with his own personal cell phone (and then ridiculously proceeded to spoliate the photograph(s) by not backing it / them up anywhere, and then claiming to have lost his phone). The Officers' taking and vouchering of some of the evidence (the photograph of the memory card packaging) shows their obvious awareness of their duty to collect and preserve important evidence. As to the evidence that they should have collected and did not - such as the video evidence and the eyeglasses - the Officers cannot now disclaim responsibility for their failure to preserve these important items of evidence because they never even asked for these items to be provided to them to be vouchered as evidence, and thus failed in their most basic law enforcement responsibilities. The Officers were at the store and arrested Plaintiff for robbery, and were provided by the store staff with whatever items of evidence they wanted to take with them, and would have been provided with the video footage and eyeglasses (and the memory card, which Edmonds says he gave them) as well had they simply requested them. The Officers thus had control of these items for purposes of a spoliation analysis because these items would have been provided to them by the store staff upon request, just as was done with the provision of the memory card packaging and the receipt showing its value that the store staff generated for the Officers and that the Officers took with them.

O'Hara has testified that he asked the Best Buy security personnel who he spoke with what he characterized as "routine questions," including if he could see the property that Plaintiff had allegedly tried to steal, and he told the security personnel that he needed to see the property

10

that Plaintiff allegedly had tried to steal, and testified that the store's security personnel were aware of the "procedure" they were to follow when they call the police about an accused shoplifter, including that the arriving officer would ask to "see the evidence, you know, the item that was alleged to have been stolen, and print up a receipt for the monetary value of that item …." *See*, Pl. 56.1 Cntrstmnt ¶¶ 65, 75.  Any minimally responsible Police Officer's routine questions and procedures would  have included immediately requesting and preserving relevant surveillance footage and all of the critical physical evidence that would be needed during the course of the prosecution for this serious felony, and for any civil litigation that might stem from the arrest and prosecution, and the Officers should be held responsible for the spoliation of these important items of evidence that they made no effort whatsoever to have preserved.

The Officers failed in their basic duty to seek to preserve these important items of evidence.  Had these important items of evidence been preserved, it may well have caused the dismissal of, or the significant downgrading of, the robbery charges that the Officers lodged against Plaintiff.  *See, e.g.*, Russo v. City of Bridgeport, 479 F.3d 196, 209 (2d Cir. 2007) ("[a]n officer's duty to investigate specific, readily-verifiable claims of innocence in a reasonable time period clearly covers reviewing a surveillance camera video record of a crime, when, as here, it was an easily available piece of physical evidence"); *see also*, Mitchell v. City of New York, 841 F.3d 72, 78 (2d Cir. 2016) (quoting Colon v. City of N.Y., 60 N.Y.2d 78, 82 (N.Y. 1983) for the proposition that "[T]he failure to make a further inquiry when a reasonable person would have done so may be evidence of lack of probable cause."); Jocks v. Tavernier, 316 F.3d 128, 135 (2d Cir. 2003) ("under some circumstances, a police officer's awareness of the facts supporting a defense can eliminate probable cause"); Kerman v. City of New York, 261 F.3d 229, 241 (2d Cir.

11

2001) ("[a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence,

(citing <u>Kuehl v. Burtis</u>, 173 F.3d 646, 650 [8th Cir. 1999]); *See also*, <u>Bradley v. Jusino</u>, 2009

WL 1181617 (SDNY)(Sweet, J.) at *8:

> Many courts, including those in this Circuit, have recognized that in certain circumstances, an arresting officer is obligated to make a minimal inquiry before making an arrest. *See Jocks v. Tavernier,* 316 F.3d 128, 135-36 (limiting *Ricciuti v. N.Y. City Transit Auth.,* 124 F.3d 123 (2d Cir.1997) in circumstances where an officer "deliberately disregard[ed] facts known to him which establish justification"); *Kuehl v. Burtis,* 173 F.3d 646, 650 (8th Cir.1999) (recognizing officers' "duty to conduct a reasonably thorough investigation prior to arresting a suspect" in the absence of exigent circumstances); *Merriman v. Walton,* 856 F.2d 1333, 1335 (9th Cir.1988) ( "Under these circumstances, there is no probable cause. A reasonable police officer would have made further inquiry before effecting a warrantless arrest."); *BeVier v. Hucal,* 806 F.2d 123, 128 (7th Cir.1986) (holding that an "officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest"); *see also Oliveira v. Mayer,* 23 F.3d 642, 647 (2d Cir.1994) (citing with approval *BeVier*'s holding that "[r]easonable avenues of investigation must be pursued [to establish probable cause] especially when, as here, it is unclear whether a crime had even taken place").

Judge Gorenstein also held that Plaintiff had not sufficiently demonstrated that the

evidence would have been favorable to him under <u>Brady v. Maryland</u>, 373 U.S. 83, 86-87 (1963).

But Plaintiff indeed did point out specific, non-speculative reasons why the spoliated evidence

would have been favorable to him in his criminal case, and why its absence is so prejudicial to

him in the instant litigation.  For example, the jury in this case will not see the surveillance video

footage, and thus will not see Plaintiff's innocuous and lawful behavior in the store, or the precise

depiction of Edmonds' face (which also will not be seen because of the spoliation of the cell phone

photograph(s) that O'Hara took of Edmonds' face).  The jury in this case will not be able to look at

Edmonds' supposedly broken eyeglasses, and evaluate if the damage to them is or is not consistent

with Edmonds' alleged injuries and the narratives concerning how those alleged injuries were
allegedly caused.  The jury in this case will not get to look at the memory card packaging (or even
the original, color picture of it that O'Hara took, which has also been spoliated) that Plaintiff
allegedly tore open with his hands and stuffed into a toilet paper dispenser, to see whether or not it
is in fact torn in a manner consistent or inconsistent with the narratives given (or if it is even torn at
all), and to see whether or not it still in fact had a memory card in it.  The jury will not get to hear a
fingerprint expert's analysis of the packaging and the memory card, and that no fingerprints of
Plaintiff's could be found on them despite the allegation that Plaintiff manipulated both items
intimately with his hands (and will not get to hear that some of the Officers' and / or the store
personnel's latent fingerprints were able to be lifted from these same items, which is likely because
the Officers and the store employees admittedly handled them).  All of this evidence would have
been favorable to Plaintiff for non-speculative reasons, and the jury in this case will not get to
evaluate any of it, precisely because the items have been spoliated.[6]

    Plaintiff of course cannot say exactly what the spoliated video footage would depict because
it is gone, but he knows it would be exculpatory because, as he has testified at his deposition in
this case: (1) he never stole anything, nor attempted to steal anything, at the Best Buy store on
September 20, 2011, (2) he did not bring any merchandise of any kind into the bathroom of the
Best Buy, (3) the only items of merchandise that he touched at the store were flashdrives (USB
keys) as he perused for the one he eventually purchased, and (4) he never at any point touched
any memory card at the Best Buy on September 20, 2011.  *See*, Plaintiff's dep. (**Exhibit 16** to

---

6 O'Hara at his deposition recognized the potential evidentiary importance of having these
original items for purposes of conducting a fingerprint analysis.  *See*, Pl. 56.1 Cntrstmnt ¶ 117.

Rothman Decl.) at 144:12-18, 145:22-25, 362:7-364:8, 369:4-370:17.[7]  Plaintiff also cannot state

precisely what O'Hara's cell phone photograph(s) of Edmonds's face or broken glasses would look

like, because he has never seen the photograph(s), but he knows that he did not attack Edmonds

with a head-butt(s), and that these items would be inconsistent with that lie.  Plaintiff also does not

know exactly what latent fingerprints would be able to be lifted from the packaging and the

memory card, but he knows he never touched these items and that his prints could not possibly be

on them, and that the Officers' and store personnel's prints would likely be able to be lifted from

these items because they have admitted to handling these items (and a jury would be impressed

with Plaintiff's putting forth the proposal to test these items for fingerprints whether or not the

Officers' or the store personnel's prints were in fact able to be lifted from these items, because if

Plaintiff's prints indeed were found on these items his credibility would be eviscerated).  These

explanations of how the evidence would be favorable to Plaintiff are sufficient.  The fact of

Defendants' spoliation of the evidence cannot provide their defense to the spoliation motion, and

Plaintiff cannot be required to state in intimate detail precisely what the spoliated evidence would

---

7 Descriptive words from Plaintiff (who opposing counsel will likely attempt to attack at trial on
the basis of, *inter alia*, his mental illness and a previous felony conviction, and who was by
himself in the store and has no other witnesses other than the store staff, who are entirely hostile
to him) only go so far, and the trite old saying "a picture is worth a thousand words" is magnified
exponentially with regard to the value of video footage (moving pictures).  The video evidence is
gone forever, because these Police Officer Defendants did not consider obtaining it from the
store in connection with the robbery arrest that they were making (either when they initially made
the arrest, or when O'Hara returned to the store to return the memory card packaging, or at any
other time).  Whether surveillance video footage existed should have been one of these Police
Officers' "routine questions" that they asked of the store staff, and part of their regular
"procedure" when making arrests at retail stores.  Any competent police officer should know the
evidentiary value of surveillance footage and seek to obtain it when making an arrest, especially
for a serious felony offense.

show, for that would be rewarding Defendants for their spoliation.  *See*, e.g., Treppel v Biovail

Corp., 249 FRD 111, 123 (SDNY 2008):

> "The burden placed on the moving party to show that the lost evidence would
> have been favorable to it ought not be too onerous, lest the spoliator be permitted
> to profit from its destruction." *Heng Chan*, 2005 U.S. Dist. LEXIS 16520, 2005
> WL 1925579, at *7; see also *Residential Funding*, 306 F.3d at 109; *Kronisch*, 150
> F.3d at 128 ("[To] hold[] the prejudiced party to a strict standard of proof
> regarding the likely contents of the destroyed evidence would subvert the
> prophylactic and punitive purposes of the adverse inference, and would allow
> parties who have intentionally destroyed evidence to profit from that
> destruction.").

Judge Gorenstein cites to this principle at pages 6-7 of the Opinion, and thereafter proceeds later to

ignore it by holding Plaintiff "to too strict a standard of proof regarding the likely contents of the

destroyed evidence."  Kronisch v. United States, 150 F.3d 112, 128 (2d Cir. 1998).

Concerning the spoliation of the cell phone photograph(s) of Edmonds' face, being deprived

of these significantly prejudices Plaintiff in advancing his argument that the photographs did not

depict injuries (if any) that would rise to the level necessary to show the "physical injury"

necessary under New York law to sustain a robbery charge[8].  Similarly, the failure of the Officers

---

8 O'Hara was aware that Edmonds did not require any medical care stemming from the incident
with Plaintiff.  *See*, O'Hara's April 3, 2013 testimony at Plaintiff's Criminal Trial (**Exhibit 17** to
Rothman Decl.) at 105:16-25.  The extent of injury to Edmonds (if indeed there was any) is
important, as the crime of robbery has as elements both stealing and the causation of physical
injury.  "Physical injury" is defined by the Penal Law as "impairment of physical condition or
substantial pain."  *See*, New York State Penal Law § 10 (9).  Whether Edmonds indeed
experienced a cut that was bleeding, or merely an abrasion and / or bruising, was highly
important in the criminal case and remains highly relevant in the instant litigation (particularly
concerning whether or not O'Hara had probable cause to believe that Plaintiff should be
prosecuted for Robbery in the Second Degree).  *See*, e.g., People v. Oquendo, 134 A.D.2d 203
(N.Y. App. Div. 1st Dep't 1987), app. denied, 70 N.Y.2d 959 (N.Y. 1988) (evidence did not
support first degree burglary and third degree assault [which also require "physical injury" as an
element] convictions where victim's injury consisted solely of pain experienced at the time of the

to take and voucher the eyeglasses as evidence prevents Plaintiff from arguing at trial that

whatever damage (if any) there was to the glasses (the location of any particular bend or break, if

any) is inconsistent with the narrative(s) provided as to how the injuries purportedly occurred and

/ or to the location of any injuries on Edmonds' face.  Plaintiff has demonstrated the relevance of

these items and the prejudice from their absence.  Even had he not done so, however, their

relevance and the prejudice from their absence could be presumed under the circumstances at

bar.  *See*, Casale v. Kelly, 710 F. Supp. 2d 347, 365 (S.D.N.Y. 2010) (citing Residential Funding

Corp. v. DeGeorge Financial Corp., 306 F.3d 99, 107 (2d Cir. 2002)) ("Relevance and prejudice

may be presumed when the spoliating party acted in bad faith or in a grossly negligent manner.").

    Other than with regard to Officer O'Hara's cell phone, which he claims he accidently lost[9]

(also admitting that he never did anything to voucher or otherwise back up the photo(s) he took of

Edmonds' face prior to the camera's loss), there is no dispute that Defendants' deliberately

spoliated the evidence at issue.  O'Hara admits that he returned the allegedly torn packaging to the

store so that they could try somehow to sell it (even though that makes no sense at all), and he

---

commission of the crime (the severity of which was undetermined) and some bruising); *see also*,
People v. Ingram, 143 A.D.2d 448 (N.Y. App. Div. 3d Dep't 1988) (evidence did not establish
that defendant caused "physical injury" to victim within purview of Penal § 160.10(2), Robbery
in the Second Degree, where the victim testified that the defendant (1) hit her with his fist on her
cheek, knocking her to ground and causing her to tremble, (2) hit her in face, causing her pain,
(3) hit her in arm, and (4) shoved her to floor); *see also*, Pl. 56.1 Cntrstmnt ¶¶ 98-102 (providing
some of the varying descriptions of Edmonds' purported injuries that were given by O'Hara,
Edmonds, and Best Buy employee Richard Castellano).

9 Intent to destroy evidence is not necessary for spoliation sanctions to be warranted.  The
Second Circuit has held that "the 'culpable state of mind' factor [for spoliation] is satisfied by a
showing that the evidence was destroyed 'knowingly, even if without intent to [breach a duty to
preserve it], or *negligently*.'"  Residential Funding Corp. v. DeGeorge Financial Corp., 306 F.3d
99, 108 (2d Cir. 2002) (brackets in original) (italics in original) (citation omitted).

admits that he did nothing to try to preserve the any of the other items of evidence at issue.  There are no material disputes of fact in this regard.  There are only O'Hara's admissions of his acts and omissions that caused this important evidence to not be available to Plaintiff in this case.  O'Hara purposefully gave critical evidence from a robbery case back to the store, and – as discussed above – the Officers never even asked to be provided with other critical evidence, such as the video footage and Edmonds' glasses (which would have been given to them had these items of evidence been requested), thus causing their spoliation.  The Officers - who were partners acting together throughout the night of Plaintiff's arrest - have through their actions and omissions shown a culpable mind with regard to all of the items of spoliated evidence.

All of the Officers' spoliation of the evidence occurred before Plaintiff's acquittal on April 5, 2013, so Judge Gorenstein's discussion of the time period between the acquittal and the filing of the instant lawsuit (Opinion at 13) has nothing whatsoever to do with the spoliation issue at bar.  Judge Gorenstein was also incorrect, in any event, that Plaintiff's acquittal would have extinguished Defendants' preservation obligation.  In fact, it was only upon Plaintiff's acquittal that Plaintiff's malicious prosecution claims even accrued.  Malicious prosecution suits require, as an element of the offense, "'the termination of the proceeding in favor of the accused.'"  Smith-Hunter v. Harvey, 95 N.Y.2d 191, 195 (2002) (quoting Broughton v. State of New York, 37 N.Y.2d 451, 457 (1975)).  Judge Gorenstein's erroneous analysis in this part of the Opinion would have the same event that causes the accrual of a claim be the event that extinguishes Defendants' duty to preserve evidence with regard to that claim.  Indeed, Defendants' civil common law duty to preserve evidence arises when litigation could reasonably have been anticipated, which in this case was well before either the litigation actually

17

commenced or the charges against Plaintiff were dismissed.  <u>Zubulake v. UBS Warburg LLC</u>,

220 FRD 212, 217 (S.D.N.Y. 2003); <u>Turner v. Hudson Transit Lines, Inc.</u>, 142 F.R.D. 68, 73

(S.D.N.Y. 1991).

      Under the outrageous and absurd circumstances at bar - with regard to each of the

spoliated items of evidence individually, and certainly collectively - striking the Defendants'

answers is an appropriate sanction.  If the Court nevertheless is disinclined to strike the

Defendants' answers, the Court should hold that Plaintiff is entitled to an adverse inference

instruction to the jury.  An appropriate instruction would be that the jury should - or at the very

least may - presume that each and all of these spoliated items of evidence would have supported

plaintiff's version of events, and that their absence should - or at the very least may - be deemed

as conclusive evidence of the Police Officer Defendants' conspiracy with the Best Buy staff to

have Plaintiff be falsely arrested and to attempt to frame Plaintiff for crimes that he did not

commit[10].  Judge Gorenstein stressed that he was not opining on the propriety or the lack of

propriety of a decision to be made at trial concerning a permissive adverse inference charge.  The

Court has all the necessary facts and evidence before it that it needs, however, to grant an adverse

inference charge as a proper sanction (if it deems that as a proper sanction), and in that event it

should fashion an appropriate adverse inference charge prior to the onset of the trial, so that the

Plaintiff can plan his approach to the trial in light of same.

---

10 If the Court decides that an adverse inference instruction is the proper sanction, Plaintiff
respectfully requests the opportunity to propose a particular instruction in light of what the Court
ultimately decides.

Lastly, an award of attorney's fees to Plaintiff in connection with the instant motion also would be appropriate.  *See,* e.g., <u>Sekisui Am. Corp. v. Hart</u>, 15 F. Supp. 3d 359, 382 (S.D.N.Y. 2014) (awarding attorney's fees to plaintiff in connection with a successful motion for spoliation sanctions); <u>Taylor v. City of New York</u>, 293 F.R.D. 601, 616 (S.D.N.Y. 2013) ("The Court's imposition of spoliation sanctions warrants the award of reasonable attorney's fees and costs to Plaintiff for his efforts with respect to this motion.  Such a monetary award is appropriate because it serves the remedial purpose of making Plaintiff whole for the costs he has incurred as a result of Defendants' spoliation.").[11]

## <u>CONCLUSION</u>

Based on the foregoing, Plaintiff's Rule 72 Objections should be sustained, his motion for spoliation sanctions against Defendants granted, and he should be awarded attorney's fees.

Dated:  New York, New York
            April 28, 2017

_____/S/_____
JEFFREY A. ROTHMAN, Esq.
315 Broadway, Suite 200
New York, NY 10007
(212) 227-2980

Attorney for Plaintiff

---

11  Attorneys' fees can be awarded upon a finding of spoliation of evidence even when the underlying lawsuit against the spoliator is dismissed.  *See,* e.g., <u>Sekisui Am. Corp. v. Hart</u>, 15 F. Supp. 3d 359, 382 (S.D.N.Y. 2014) (dismissing counterclaim against plaintiff but ordering plaintiff to pay attorneys' fees to defense counsel pertaining to defendant's spoliation motion).

19